No. 14,381.

WILSON ET AL. *v.* THE PEOPLE.
(84 P. [2d] 463)

Decided October 17, 1938.   Rehearing denied November 21, 1938.

Mr. V. G. Seavy, for plaintiffs in error.

Mr. Byron G. Rogers, Attorney General, Mr. Reid Williams, Assistant, for the people.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

Plaintiffs in error were convicted and sentenced on four counts of an information based on the statutes of Colorado with respect to gambling and to review the judgment of the district court based thereon they have sued out a writ of error.

The pertinent statutes under which the charges were brought are sections 229, 230, 231, chapter 48, '35 C. S. A., which, so far as here material, are respectively as follows:

"§229. If any person shall keep any room, building, arbor, booth, shed or tenement of any description, to be used or occupied for gambling, or shall knowingly permit the same to be used or occupied for gambling * * * the person so offending shall, on conviction thereof, be fined in any sum not less than thirty dollars nor more than five hundred dollars, or be imprisoned in the county jail not less than ten days nor more than thirty days, or both, at the discretion of the court; and if the owner of any room, building, arbor, booth, shed or tenement of any description shall know that any gambling tables, apparatus or establishment is kept or used in such room, building, arbor, booth, shed, or tenement for gambling and winning, betting or gaining money or other property, and shall not forthwith cause complaint to be made against the person so keeping or using such room, building, arbor, booth, shed or tenement, he shall be taken,

held and considered to have knowingly permitted the same to be used and occupied for gambling. Every day for which any person or persons shall keep any house, room, building, tent or tenement of any description, to be used or occupied for gambling, and shall knowingly allow any such place to be used or occupied for gambling, shall be deemed and held to be a separate and distinct offense.''

''§230. If any person shall keep or exhibit any gaming table, establishment, device or apparatus to win or gain money or other property, or shall aid, assist or permit others to do the same, or if any person shall engage in gambling for a livelihood, or shall be without any fixed residence, and in the habit and practice of gambling, he shall be deemed and taken to be a common gambler, and upon conviction thereof shall be imprisoned in the county jail not less than three months nor more than one year, and be fined in any sum not less than two hundred dollars nor more than five hundred dollars.''

''§231. If any person shall play at any game whatsoever, for any sum of money or other property of value, or shall make any bet or wager for any sum of money or other property of value, upon the result of such game, every such person shall, on conviction thereof, be fined in any sum not less than fifty dollars nor more than one hundred and fifty dollars.''

The charges in the four counts of the information are as follows:

''Tex Wilson and Edward Burton did unlawfully engage in gambling for a livelihood and was then and there in the habit and practice of gambling contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Colorado.

''Tex Wilson and Edward Burton did unlawfully keep and exhibit a gaming table, establishment, device and apparatus to win and gain money and other property, and did then and there unlawfully aid and assist others to

do the same, contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Colorado.

"Tex Wilson and Edward Burton did unlawfully keep a certain room, building, shed, arbor and tenement to be used and occupied for gambling, and did then and there unlawfully and knowingly permit the said room, building, shed, arbor and tenement to be used and occupied for gambling, contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Colorado.

"Tex Wilson and Edward Burton did unlawfully play at a game for a sum of money or other property of value, contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Colorado."

The first count is based on section 230, supra, the second on section 230, the third on section 229 and the fourth on section 231.

Plaintiffs in error, herein designated as defendants, present seven assignments of error which we shall consider in the order alleged.

The first assignment is directed to the first count of the information. Defendants contend that the count is insufficient in that it does not allege either in substance or in the words of the statute that defendants were without any fixed residence. Conceding that, in order to establish that they were common gamblers, this may be necessary in conjunction with the allegation that defendants were in the habit and practice of gambling, it does not follow that the first count is insufficient, for it does charge in the language of the statute that defendants engaged in gambling for a livelihood. If this is true it is immaterial whether they had a fixed residence or not, for gambling for a livelihood is a violation of the statute irrespective of the question of residence. We hold the count good as charging a violation of the law by one of two prohibited means. This is in accordance with the

principles we have repeatedly announced. *Howard v. People,* 27 Colo. 396, 61 Pac. 595; *McClure v. People,* 27 Colo. 358, 61 Pac. 612; *Walt v. People,* 46 Colo. 136, 104 Pac. 89; *Pettit v. People,* 24 Colo. 517, 52 Pac. 676; *Rowe v. People,* 26 Colo. 542, 59 Pac. 57; *McLean v. People,* 66 Colo. 486, 180 Pac. 676.

██ By the same assignment of error defendants raise the issue of whether they may be tried jointly for engaging in gambling for a livelihood. They contend that engaging in gambling for a livelihood is for a personal or individual purpose; that the objective is individual and personal and not joint. We see no merit in this contention. Intent, in crimes where that is an ingredient, is personal and individual. From its very nature it is a state of mind and of necessity personal to the one entertaining it. We know of no case holding or in which it was even contended, that two persons could not be tried jointly for the murder of another solely because in the commission of the crime the intent with which each acted was personal to him and not joint. Whether one engages in gambling by himself with intent to secure a livelihood for himself by procuring directly the proceeds of the enterprise, or with another with the intent to gain a livelihood by securing by their joint efforts the spoil and then dividing it is of no consequence in cases of this character. As two may be tried jointly for murder, though the intent of each was personal to him, so two may be tried jointly for gambling for a livelihood though the intent of each to secure a livelihood was personal to himself.

██ Defendants' second assignment of error is that the evidence on behalf of the people failed to sustain the allegations of the fourth count of the information and failed to show that the defendants had played at a game as therein alleged and for the further reason that said count is defective because alleged in the disjunctive and therefore failed to charge a crime. We think the first reason presented by this assignment has no basis in fact.

When the officers broke into the defendants' room they found them there with a great number of papers shown by the evidence to be racing forms; there was a dining table with three telephones on it; and when the officers entered, defendants said, "there was no use trying to cover up." The telephones were ringing constantly. The defendant Burton said that these were customers who would bet "that they wont." Defendant Wilson had been arrested in a room in the Cosmopolitan Hotel in Denver with a similar setup. The officers found him in the possession of similar racing forms; he had plead guilty to running a gambling house at that time, and had been fined. Officers familiar with the operations of bookmakers stated that many of these received their information from Omaha and an officer of the telephone company testified that large numbers of telephone calls were put through by defendants to that city. Defendant Wilson when arrested said to the sheriff, "here is fifty dollars," which the officer refused. A police officer of the city of Denver stated that he had talked with numbers of people concerning the occupation of Tex Wilson and that he had the reputation of being a gambler. We think there was ample evidence to justify the jury in finding that defendants were engaged in betting on horse racing, which constitutes a game within the meaning of the statute. *Everhart v. People,* 54 Colo. 272, 130 Pac. 1076. We think the evidence was sufficient not only to sustain the fourth count of the information—that defendants did unlawfully play a game for a sum of money or other property of value—but that it was sufficient to sustain the allegations of all of the other counts of the information.

■■ Defendants stress particularly the fact that the evidence failed to establish that they had played at a game, because it did not specify with whom they played, and they say that the presumption, where this is not disclosed, is that they played with each other. We think the evidence is amply sufficient to show that both defendants were on the same side of the game. If they played

at a game on which they were both on one side and the customers, to which they referred, were on the other, they were guilty under the statute. If they played at the same game with each other they likewise would be guilty. It is the action of playing with the aim of gain that is the gist of the offense. If they played together against others or with each other they violated the statute. Not having asked for a bill of particulars requiring the district attorney to specify whether they were charged with playing with each other, or together with others, and since either action constitutes a violation of the law, they cannot now successfully contend that the offense has not been proven as charged.

The second assignment of error also raises the question of whether the allegation that defendants played for money *or* property vitiates the fourth count of the information. They assert that the allegations should have been made in the conjunctive; that they played for money *and* other property of value. We recognize the general rule, too well settled to require citation of authorities, that where the means by which a crime may be committed are set forth in the statute in the disjunctive, they should be alleged in the information in the conjunctive. But that rule is not applicable here. We think the purpose of the statute is clear; it can be violated only in one way and that is by doing the one thing it interdicts, which is the playing of a game for the purpose of gain. The words "money or other property of value" comprehend nothing more than the playing of a game for property of all kinds, because money is property.

The third assignment of error is directed to the ruling of the court permitting the jury to take the exhibits introduced in evidence to their jury room over the objection of the defendants. It appears that exhibit A consisted of a bushel basket full of papers found in the room by the officers at the time of the arrest. This bushel basket full of papers was offered as one exhibit by the people and admitted by the court without objec-

tion on the part of the defendants. Several of the papers were specifically identified and called to the attention of the jury. When this exhibit was offered in evidence it was admitted without objection and we think it may be assumed that the defendants' counsel considered it competent, for he was viligant in making objections and preserving his record by exceptions throughout the trial of the case. Counsel asserts the proposition that it was not permissible at common law for the jury to take exhibits to their jury room, and he calls attention to section 486, chapter 48, '35 C. S. A., which is in part as follows: "All trials for criminal offenses shall be conducted according to the course of the common law, except when this chapter points out a different mode, and the rules of evidence also of the common law shall, unless changed by this chapter be binding on all courts and juries in criminal cases."

At common law the rule seems to have been that while exhibits other than writings might be taken to the jury room if the court in the exercise of a sound discretion deemed it advisable, that only papers under seal might be so taken. To this effect, see the historical discussion of the rule contained in *Higgins v. Los Angeles Gas & Electric Co.*, 159 Cal. 651, 115 Pac. 313.

Thompson in his work on trials, second edition, volume 2, section 2574, discusses this rule as follows: "With respect to papers which might be taken to the jury room, the old law, it seems, made a difference between exemplifications of papers under seal and sworn copies. The former were of so much higher authority as evidence than the latter, that the former were permitted to be taken out by the jury, while the latter were not. The reason was, that the seals of courts, of public officers, of corporations, and of individuals, were generally known and would hence be recognized by the jurors, while unsealed instruments would not. The rule accordingly was, that 'exemplifications and instruments quoe sibi ipsa faciant fidem'

were to be delivered to the jury to take out with them, while in the case of instruments of lesser dignity, this was not so. The rule was thoroughly settled in the early English practice, and is expressed in a great number of old books and cases. It raised a distinction between writings which had been *given*, and writings which had been *delivered* in evidence. Nothing could be delivered in evidence, that is, taken out by the jury when they retired to consider of their verdict, save that which was of record or under seal, except by consent. With the decay of the use of private seals, the reasons on which this distinction rested gradually ceased; and the fallacy of the distinction itself, and of the rule which prevented the jurors from taking on their retirement instruments of evidence, was pointed out in vigorous language by Tilghman, C. J., and Yeates, J., in an early Pennsylvania case. Nevertheless, as we shall presently see, this foolish rule still inheres to a great extent in our judicial procedure; and while a lawyer would be thought crazy who would suggest the idea of withholding from the *judge*, sitting as a trier of the facts, or from a *referee*, the inspection of all the instruments of writing which had been offered in evidence, the bench and bar in many jurisdictions readily acquiesce in the idea that, to send these instruments out with the jury had some dangerous and vitiating effect,— forgetting that such a conception involves an entire impeachment of the capacity of the jurors to discharge the functions of their office, and with it a gross accusation of the system of trial by jury."

Continuing in section 2575 he says: "The modern practice is believed to be to send to the jury-room all documents and papers, *other* than depositions, which have been received in evidence. In the absence of prohibitory legislation, it is certainly in the discretion of the judge to permit such papers to be taken out by the jury."

In support of the foregoing statements Thompson cites the following cases, most of which upon examination will

be found to support his conclusions: *Alexander v. Jameson*, 5 Binn. (Pa.) 238; *Hovey v. Thompson*, 37 Ill. 538; *Hanger v. Imboden*, 12 Mo. 85; *St. v. Thompkins*, 71 Mo. 613; *Schappner v. Second Ave. R. Co.*, 55 Barb. (N. Y.) 497; *Shomo v. Zeigler*, 10 Phila. (Pa.) 611; *Mullen v. Morris*, 2 Pa. St. 85; *Seibert v. Price*, 5 Watts & S. (Pa.) 438; *Sholly v. Diller*, 2 Rawle (Pa.) 177; *Sanderson v. Bowen*, 4 Thomp. & Co. (N. Y.) 675; *Porter v. Mount*, 45 Barb. (N. Y.) 422, 428; *R. C. Stone Milling Co. v. McWilliams*, 121 Mo. App. 319, 98 S. W. 828; *San Antonio & A. P. Ry. Co. v. Barnett*, 12 Tex. Civ. App. 321, 34 S. W. 139.

It is apparent that the reasons assigned for the rule as enforced at common law have ceased. With the total disappearance of the use of private seals, the effect of the present enforcement of the rule would be to exclude from examination by the jury all written documents or papers introduced as exhibits, and this notwithstanding the fact that the generally increased educational attainments of jurors being such that all of them can read has nullified the reason for the rule assigned under the common law.

In an early Pennsylvania case (1812) *Alexander v. Jameson*, 5 Binney 238, the three justices of the court, Tilghman, Yeates, and Brackenridge each wrote a separate opinion discussing this rule. It was contended by counsel for plaintiff in error that the common law as to jury trials had been taken in extenso from the English code. That this contention was assumed by the court to be correct is apparent from the opinions of the justices. Among other things Tilghman, C. J., in his opinion said: "We are somewhat in the dark as to the reason of this distinction between sealed and unsealed writings, but it is certain that it originated under circumstances not applicable to the present times. The best account of it is to be found in the writings of Lord Hale and Lord Gilbert. They say that in ancient times, men of rank and property had seals by which their families were distin-

guished. Those were not numerous; and as causes were tried by men in the neighborhood, it was supposed that the seals were so notorious as to be well known to the jury. Papers under seal therefore, carried their own evidence along with them; and indeed it is probable that in many instances it was thought sufficient to affix a seal without any subscribing witness, so that the instrument was authenticated by the seal alone. But the notoriety of seals has long ceased. Every man now takes what seal he pleases. They are no longer a family distinction, and so far has it been carried in this and some other states, that a flourish with the pen in the place of a seal has been held equivalent to a seal. It is to be observed, that although the rule is laid down as I have mentioned in the English books, yet it does not appear that the point has been brought before any court for the last half century, during which period the commerce of the world has been prodigiously enlarged, and commercial people make very little use of seals in their transactions. I have never known this question expressly decided in Pennsylvania; but I take it, that in practice, the English rule has not been extended here. It has been our custom to deliver to the jury all written papers except depositions taken under rule of court. These have been withheld, because it has been thought unequal, that while the jury were not permitted to call the witnesses before them who had been examined in court, they should take with them the depositions of other witnesses not examined in court. After the uniform practice which has prevailed in this state, I cannot consent to the establishment of a rule which in many cases would produce confusion and injustice. I have witnessed the trial of many causes, particularly of the mercantile kind, in which the jury could not decide without the aid of unsealed papers; causes which required the minute and laborious investigation of a variety of books and papers, in which long calculations were necessary, founded on accounts and entries. To tell the jury that they must form their verdict on the recollection

of what had passed at the bar, would be imposing on them a most unreasonable duty. Under such circumstances, they could do no more than make a vague guess at the truth, and their verdict might be an abuse, instead of a satisfactory administration of justice. I am of opinion therefore that the court of common pleas had a right to permit the jury to take out with them the book which had been given in evidence, and that the judgment should be affirmed.''

Yeates, J., in his opinion said: "I would not agree to remove an unbroken pillar of the common law, which might serve in any degree to support the general system, or to change the grounds upon which property has rested permanently for ages, merely because we cannot at this day discern the correctness of its principles. But I profess no veneration for the rubbish of antiquity, resting on foundations inapplicable to the present state of society.''

After commenting on the fact that mere circles in ink had come to be substituted for impressions in wax or other kinds of seals that were distinctive in character he says: "In this state of things there can be no utility in preserving the old distinction, that sealed instruments may be taken out by the jury, to be inspected in their chamber, but not unsealed ones. Whether a paper proved to be genuine and shown in evidence to the jury has a seal or not, the facts imparted by its contents must produce the same effects on considerate minds. The reason for the distinction has long ceased, and with it the law has also changed.''

The question has never been passed upon by an appellate court in this state and since Mr. Justice Brackenridge in his opinion analyzes the matter with such clarity it seems not improper to quote from it at length even though by so doing this opinion may be extended beyond ordinary limits. He said: "The science of the law is improved in proportion as it is brought nearer common sense and the understanding of mankind. We have seen

the struggle of the legislature to get quit of fictions and technical subtleties, and why should not courts reform in practice what they may reform? Why should it be left to a dwarf, according to the expression of Junius, to do the work of a giant? I speak of what the courts may do, compared with what is practicable by the legislature, in respect to reforming rules of construction, rules of evidence, and usages of practice. There is an extent to which the courts cannot go, which is to abolish the technical distinction in the use of seals altogether, because acts of assembly recognize them; such as the distinction between notes not under seal, and bonds with the annexing of seals. This, as regarding the statute of limitations, or other presumption of the effect of seals. Seals might be of use, where there were seals distinguishing identity. Coats of arms came in with the Normans, taken from the engraving on the shields; and these cut on stone or metal, or other material, might be of notoriety, and distinguish persons. But this has ceased to be a use of them, with a greater mass of the people, even in the countries of chivalry; and here in these states, never could be said to have had much existence. Few of the emigrants could boast an ancestry. There is no magic in words, said a learned judge, meaning mere terms; much less I would say can there be magic in seals. To talk of seals ascertaining any thing now, or assisting to ascertain, cannot be comprehended, unless it could be thought that there was some charm in them, some spell to work evidence. It is as unmeaning as to any effect of this nature, as the word Abracadabra put at the end of a signature. Why should writings go to a jury at an early period, when they could not read? It saved the neck of a felon to be able to read a verse. They could examine a seal as to its form, or what was cut upon it, so far as respected images of substantial things; but the arbitrary marks of letters were unknown to them. The excluding unsealed instruments or papers might be said to be founded in one reason, according to the technical notions of the times.

Every writing not under seal, came under the denomination of parol. And because oral testimony could not go but in the mind, this other parol could not go by the hand. But there is a use in letting all go by the hand that can be carried; for it will assist the recollection and refresh the memory. Startled by some doubt on this subject, I have heard of a judge, a president of the Common Pleas, ruling that a letter might go, because in fact it had been under seal. But I believe we should smile, or wring the face with a grimace irresistible, to talk of letters going under this subtlety. And yet, in mercantile causes especially there would be no possibility of a fair examination without letting them go, whether the counsel objected or otherwise. In land trials, what is to be done with field notes, drafts, and scrapings of office, unless by a fiction, we could suppose them as drawing with them the seal above in the office to which they belong. But there was a time, when there was no seal in the office; and this auxiliary would not suffice. How could juries judge of original books of entries, of accounts or calculations and set off, without having them with them? Every case of this kind would have to go to auditors or referees. An agreement not under seal, could not go, though it contained many stipulations. We do not sit here, said a learned judge, to take our rules from Siderfin and Keble, nor do we sit here to be bound by every rule of a former period. We are not cerfs adscript to the clods of decisions. If we thought ourselves bound by every rule of the common law, it would furnish the best reason for abolishing it. The reason of the law, says Lord Coke, is the life of the law. And will not the reason cease with a change of situation and circumstances? In an enchanted island we might not find ourselves at liberty. But however judges might be bound by every rule of jurisprudence in the island of Great Britain, we have crossed the ocean, and are at the distance of three thousand miles. Our situation is changed, and it is only such parts of the common law as have been introduced by usage,

that we are to regard. And not all that; for we have the right to change a usage, so far as respects our rules of practice. Will common sense and sound policy exclude writings from the jury that are not under seal, and carry the distinctions of rude times into our jurisprudence? Though Holt and Hale and Coke may have been entramelled by them, we ought not to be. It would be like taking the skin of a dead horse for a horse. I can have no doubt but that in this case the books ought to have been carried out by the jury, and therefore I affirm the judgment.''

It may be contended that the cause before us differs from the cause before the Pennsylvania court in that we adopted the common law by statute, while there, as appears at least inferentially, it had been adopted by custom and usage. We think this distinction not a sound one. The question involved is not how the common law came to be the law of our jurisdiction, but what is the common law adopted in our jurisdiction by usage, statute or otherwise. We think it clearly appears on consideration and by the authorities, that the reason underlying the rule as originally laid down and enforced by the English courts had ceased to exist when our state as a separate political entity came into existence; and that the rule of practice of the common law, for which defendants contend, did not become incorporated into our system of criminal jurisprudence.

We think that instruction No. 3 defining ''gaming table,'' to the giving of which the fourth assignment is directed, is a substantially correct statement of the law as a definition of a gaming table, establishment, device or apparatus, and that it was not error to give it. From our ruling on this assignment it follows that it was not error on the part of the trial court to refuse to give defendants' tendered instruction No. 1, of which they complain in their fifth assignment of error.

■■ The sixth assignment of error is directed to the court's ruling admitting the testimony of witness

Finney, who testified to a former arrest of Wilson and as to his plea of guilty of conducting a gambling house when arrested under circumstances similar to those of the instant case; also to his explanation of the use to which some of the forms contained in exhibit A were put, as to races in Florida and California and as to the names of race horses appearing on the writings that had been filled out. He testified that his knowledge was based on his experience as an officer and on other raids on places where betting on races was carried on. Under the circumstances we think the evidence was proper. Gambling for a livelihood was one of the charges. From the very nature of that offense it is a continuing one and may and usually does involve many separate acts. In connection with defendants' reputation as gamblers, to which detective Finney also testified, we think evidence of the former arrest of Wilson and his plea of guilty was admissible. In the light of the circumstances under which these men were arrested, from the very nature of their activities, it was necessary that they base them on races in far parts of the country, just as it is that brokers in a legitimate business base their operations on what goes on on various stock exchanges in different parts of the country. As the court indicated in one of its rulings there are certain things such as transactions on stock exchanges, matters on which men act in weighty affairs of life, that are so generally accepted that one having knowledge of them derived through the ordinarily relied upon avenues of information may testify concerning them. If as an officer Finney had knowledge that Omaha is a well known center for the clearance of information regarding the betting odds upon various entries and as to the results of races, he might testify thereto for such light as his evidence might cast on the numerous telephone calls put through to Omaha by defendants. Defendants did not see fit to take the witness stand and give any explanation of their activities consistent with innocence; and while the jury could draw no inference of guilt from such failure, if the

record discloses, as this one does, facts consistent with guilt without explanation or denial by those who knew best what they were doing—defendants themselves—they cannot complain of an adverse verdict and judgment which, being supported by sufficient competent evidence, we are not at liberty to disturb.

Assignment of error No. 7 is directed to the denial of a motion for a new trial. Considering our ruling on the other assignments it follows that there was no error in the court's ruling in this respect.

Judgment affirmed.

MR. JUSTICE HILLIARD and MR. JUSTICE BOUCK dissent.

MR. JUSTICE HOLLAND not participating.