No. 16,764.

GINSBERG v. CENTENNIAL TURF CLUB ET AL.
(251 P. [2d] 926)

Decided December 8, 1952. Rehearing denied December 26, 1952.

Mr. CHARLES GINSBERG, Mr. GEORGE LOUIS CREAMER, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAW-RENCE HINKLEY, Deputy, Mr. RICHARD F. HITE, Assistant, Mr. RICHARD H. SIMON, Mr. DAVID H. MORRIS, Mr. J. F. LITTLE, for defendants in error.

472

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

This case grows out of two separate actions filed in the district court of the City and County of Denver by plaintiff in error against the Centennial Turf Club, Inc. and Mile High Kennel Club, Inc. The two cases involved identical points of law and the controlling matters of fact were very similar. The trial court therefore consolidated them for trial. Middle Park Racing Association, Rocky Mountain Kennel Club, Inc., and the people of the State of Colorado were made parties upon their several petitions for intervention. We will refer to the parties by name or as they appeared in the trial court, where plaintiff in error was plaintiff and defendants in error were either defendants or interveners.

Plaintiff sought relief by injunction against defendants alleging in substance that the defendants were operating a "gambling racket" designated as horse and dog racing, and in connection therewith engaged in open and notorious lotteries in violation of section 2, article XVIII, of the Constitution of the State of Colorado. The issue raised by the pleadings is whether the conduct of defendants, which admittedly is in conformity with the provisions of chapter 207, Session Laws of Colorado 1949, amounts to the operation of a lottery, prohibited by the Constitution. The constitutional provision upon which plaintiff relied is section 2, article XVIII, and reads as follows: "Lotteries prohibited. — The general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."

The Act upon which defendants relied as justification for their conduct is entitled An Act Authorizing, Regulating and Providing for Licensing the Racing of Horses

and Other Animals with Pari Mutuel Wagering. The General Assembly in 1947 referred the measure to the people (Section 17, chapter 256, S.L. 1947) and at the general election in November, 1948, it was adopted by the voters. (Chapter 207, S.L. 1949.)

█ The facts concerning the operations of defendants are not in dispute upon any material point. Plaintiff filed his motion for summary judgment and supported it by an affidavit setting forth the details of the pari mutuel system of betting. From affidavits filed on behalf of defendants in opposition to plaintiff's motion, it is clear that no genuine issue as to any material fact was presented, and the trial court properly disposed of the matter upon that motion. The trial court held that the activities of defendants did not amount to the maintenance of a lottery or gift enterprise, prohibited by section 2, article XVIII, of the Constitution of Colorado. Judgment was entered accordingly, and plaintiff, seeking a reversal of that judgment, brings the case here by writ of error.

The undisputed facts, as gleaned from the affidavits of the parties, are stated with general accuracy by counsel for plaintiff in his brief, as follows:

"The Defendants operate horse and dog tracks. At those tracks there is permitted betting, through pari mutuel machines, permanently situate at the tracks, and operated under the supervision of their management.

"Pari-mutuel betting involves the use of an apparatus known as the Totalisator, leased by the defendants from American Totalisator Company, Inc., a Maryland corporation.

"Betting is accomplished by the purchase of tickets by bettors, from the Defendants. Tickets are sold through ticket windows, classified as 'Win,' 'Place,' or 'Show,' windows, and further classified by the denomination of the tickets sold, the least denomination being $2.00 and the highest $100.00.

"Animals racing are, for purposes of betting and other identification, assigned numbers.

"Moneys received from patrons upon bets are received into pools or funds, designated in accordance with the animal upon which the money is bet, and further designated as 'win,' being first place, 'place,' being second place, and 'show,' being third place. There exist additionally variant combinations, such as the 'Quinella' at the dog tracks, or the 'Daily Double' at the horse tracks, involving selection of successful animals in more than a single race.

"From each of the pools, there is deducted ten per cent (10%) for the track and five per cent (5%) for the State of Colorado. The remainder of the money, being eighty-five per cent (85%), except for certain odd amounts, known as 'breakage,' is available for distribution among persons holding tickets upon successful horses.

"The Totalisator consists of an automatic calculating machine and appurtenant equipment for each of the pools. This equipment automatically totals all of the wagers in each of the pools, and automatically transmits to display boards, every eighty (80) seconds, the amounts wagered on each starter and in each pool.

"In connection with the Totalisator, there are used automatic ticket printing machines, which print tickets upon the various animals, and in the various pools, as they are ordered and paid for by the bettors.

"Each of the display boards mentioned shows the approximate odds on each starter to win, the order of 'finish' of the first four starting animals, the price which a $2.00 ticket will pay on the first three starters, including the price to be paid in the event of dead heats, the time of the race, number of race, and time of day and post time for the next race, and the amounts of money wagered in each of the pools on each of the starters, as well as the total amount wagered in each of the three pools.

"The data, other than odds, are automatically computed, and odds are manually computed.

"In straight wagering, each person making a wager purchases a ticket in the desired sum on the animals he anticipates will win the race. At the conclusion of the race, all of the money paid for straight tickets, less 10%. to the track, 5% to the State, and breaks computed on the basis of 10¢ on the dollar to the State, is divided among persons holding tickets on the winning animals, in that proportion which the value of the tickets held bears to the par value of all outstanding winning tickets.

"Place wagering operates in similar fashion, except that the bettor, if successful, is entitled to participate in the proceeds of the 'place' pool if the animal he selects runs either first or second, the balance remaining, after deductions as explained above, being divided into two equal parts, one for the holders of place tickets on the placing animal, and the other for the holders of place tickets on the winning animal.

"Show wagering operates identically, save that there are three divisions of the balance of the pool, respectively for the persons holding show tickets on the showing, on the placing, and on the winning animals.

"Betting is opened at a specific period after the conclusion of the preceding race. Betting remains open for specified and limited period of time. During that time, odds on the various animals are constantly changing, depending upon the amounts bet on each of them. The odds are flashed to the board once each 80 seconds, and the final odds are not determined until all of the bets are in and betting closed on the race.

"There exists no relation between the bettors, all bets being made by payment to the track, as mentioned. The track does not bet against its patrons, who supply all of the funds, but distributes the sum remaining, after its commissions and those of the State of Colorado, in accordance with the method above described."

It also is undisputed that, with relation to horse rac-

ing, there is a program printed by the track management showing the number of each horse, the colors of its jockey, its post position, the approximate odds on the horse, the name of the jockey and the class of the race. Patrons who wish to study past performances of horse and jockey have available an informative periodical, the Daily Racing Form, which records for each horse entered in any race the number of its previous starts, wins, and order of finish in the current and preceding seasons, together with a statement of total purses won by each animal. The breeding, age and sex of the animal are given, and, for the most recent races, the distance covered, the time in which the course was completed, and the track condition, are shown. Similar pertinent information concerning the record of the jockey is available.

With reference to dog racing, except for the fact that there are no jockeys, there is available to bettors similar information concerning previous performances of the dogs, together with pertinent facts relating to breeding, etc., analogous to the records relating to race horses.

Question to be Determined.

*Does pari mutuel betting upon horse and dog races, carried on in the manner as hereinabove described, offend against the constitutional provision which provides that the general assembly, "Shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state?"*

██ The question is answered in the negative. At the outset we must bear in mind the cardinal rule of statutory construction, that if there is reasonable doubt concerning the validity of a statute, when tested by a provision of the Constitution, the doubt must be resolved in favor of the validity of the legislative act. *Watrous v. Golden Chamber of Commerce*, 121 Colo. 521, 218 P. (2d) 498; 16 C.J.S., p. 264. If the statute may be reasonably subject to two different constructions, one of which

would result in invalidity and the other in validity, it is the duty of our court to harmonize it with the Constitution by adopting that construction which does not invalidate the work of the legislative branch of government. In the instant case the questioned law was adopted by a substantial majority of the voters of the state, and the act should not be voided on constitutional grounds if it can be harmonized with the Constitution by construction which has foundation in reason and logic.

In Colorado a "lottery" or "gift enterprise" cannot be authorized by law. However, there is no prohibition in our Constitution which prevents the legislature, or the people, from authorizing certain forms of gambling. It unquestionably is true that.all lotteries and gift enterprises are forms of gambling, but it does not follow that all gambling is a "lottery" or "gift enterprise," as those terms are defined in law. No one would contend that a game of poker, in which money is bet upon the relative value of the cards held by the participants, constitutes a lottery, but it most certainly is a form of gambling.

The Colorado cases cited by plaintiff, as authority for holding that defendants are operating a lottery, are not applicable to the instant case because the facts are clearly distinguishable. Those cases are: *Cross v. People,* 18 Colo. 321, 32 Pac. 821; *Branham v. Stallings,* 21 Colo. 211, 40 Pac. 396; *Bills v. People,* 113 Colo. 326, 157 P. (2d) 139. The cases of *Everhart v. People,* 54 Colo. 272, 130 Pac. 1076, and *Wilson v. People,* 103 Colo. 150, 84 P. (2d) 463, are not applicable to the case at bar, for the reason that the sole issue involved in those cases was whether the gambling laws of the state were being violated. There was no statute then in existence permitting the type of gambling allegedly carried on by those against whom the actions were brought. No law was being subjected to the test of constitutionality, and it was not contended that the conduct of the defendants was violative of any constitutional provision relating to lotteries.

In *Cross v. People, supra,* our court defined "lottery and gift enterprise," prohibited by the statute adopted under direction of the Constitution, as follows: "It may be accepted as the result of the adjudicated cases, that a valuable consideration must be paid, directly or indirectly, for a chance *to draw a prize by lot,* to bring the transaction within the class of lotteries or gift enterprises that the law prohibits as criminal." (Italics ours.)

While an element of chance no doubt enters into horse and dog races, it does not control them. The bettor makes his own choice of the animal he believes will finish the race in first, second or third place. In making that selection he has available the previous records of the animal and the jockey, and various other facts which he may take into consideration in choosing the animal upon which he places a wager.

Suffice it to say that after careful study of all the authorities, we hold that the conduct of the defendants in this case, as shown by the record, does not amount to the operation of a lottery or gift enterprise in contravention of the Constitution of this state. We are fortified in this position by numerous decisions of appellate courts throughout the nation, and we are satisfied that the weight of authority is in harmony with this conclusion. *Ex Parte Pierotti,* 43 Nev. 243, 184 Pac. 209; *Commonwealth v. Kentucky Jockey Club,* 238 Ky. 739, 38 S.W. (2d) 987; *Iris Amusement Corp. v. Kelly,* 366 Ill. 256, 8 N.E. (2d) 648; *People v. Monroe,* 349 Ill. 270, 182 N.E. 439, 85 A.L.R. 605; *Utah State Fair Ass'n v. Green,* 68 Utah 251, 249 Pac. 1016; *Longstreth v. Cook,* 215 Ark. 72, 220 S.W. (2d) 433; *Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 22 N.W. (2d) 433, 166 A.L.R. 1246; *Engle v. State,* 53 Ariz. 458, 90 P. (2d) 988.

All of the states in which the above cited cases originated have constitutional provisions prohibiting lotteries, which are in substance comparable to the provisions of our own law. Statutes authorizing pari mutuel betting

on racing events were held to be valid over the contention that such betting constituted a lottery. This array of well considered decisions leads inescapably to the conclusion that a sound basis in reason and logic exists in support of that construction which upholds the legislation adopted by the people, and which harmonizes that act with the Constitution.

The judgment accordingly is affirmed.

MR. CHIEF JUSTICE JACKSON and MR. JUSTICE ALTER dissent.

MR. JUSTICE HOLLAND not participating.