Alan N. Charnes Executive Director Department of Revenue State of Colorado 486 Capitol Annex 1375 Sherman St. Denver, CO 80261
Dear Mr. Charnes:
This opinion letter is in response to your June 22, 1983 letter, in which you inquired about the constitutionality of authorizing certain gambling activities to be conducted in this state. Your letter referenced the previous letter sent to the Department of Law by Marvin Eller on June 1, 1983, in which the specific gambling activities in question were described.
QUESTION PRESENTED AND CONCLUSION
Your request for an attorney general's opinion presents the question:
Whether, consistent with the provisions of article XVIII, section2 of the constitution of Colorado, the Department of Revenue may authorize certain charitable organizations pursuant to C.R.S. 1973, 12-47-128(5)(n), as amended, to conduct the following gambling activities: poker; twenty-one (blackjack); roulette; craps; chuck-a-luck; and slot machines?
With respect to twenty-one, roulette, craps, chuck-a-luck, and slot machines, my conclusion is "no." With respect to poker, my conclusion is "yes." It is my opinion that article XVIII, section2 of the constitution of Colorado prohibits the executive director of the Department of Revenue, acting as the state liquor licensing authority, from authorizing charitable organizations to conduct twenty-one, roulette, craps, chuck-a-luck, and slot machines. Nothing in the aforesaid constitutional provisions, however, would prohibit authorizing such organizations to conduct the playing of poker under appropriate rules promulgated by the Department of Revenue.
ANALYSIS
In 1979, C.R.S. 1973, 12-47-128(5)(n) was first enacted. 1979 Colo. Sess. Laws p. 556. That statute authorized certain qualified organizations to conduct gambling events on liquor-licensed premises. The statute did not specify what gambling activities might be permitted, and no regulations have been promulgated enumerating the permissible gambling activities. As a result, qualified organizations[1] have for the past 4 years conducted numerous gambling events at which a variety of gambling games have been played.
This year the general assembly enacted Senate Bill 407, effective July 1, 1983, which amended section 12-47-128(5)(n) and required the state licensing authority to promulgate rules to regulate charitable gambling under that section. Your opinion request concerns the propriety of authorizing certain gambling games by administrative regulations pursuant to the statutory mandate.
It is well established in Colorado that rules and regulations promulgated by an administrative agency may not exceed the scope of legislative power delegated to the agency. Dixon v.Zick, 179 Colo. 278, 500 P.2d 130 (1972). In addition, such rules and regulations may not modify or contravene the statute which underlies them. Cohen v. Department of Revenue,197 Colo. 385, 593 P.2d 957 (1979).
The scope of legislative power which may be delegated by the legislature also may not exceed the legislative authority vested in the general assembly; for the legislature ". . . may not lawfully do indirectly that which it is without authority to do directly." Schwartz v. People, 46 Colo. 239, 246,104 P. 92, 95 (1909).
These principles, as applied to the question propounded by you, mean that the state licensing authority may not authorize gambling activities which could not be authorized by the legislature. The legislative delegation of authority to the state licensing authority cannot exceed the legislature's own powers. And any regulation which would transgress the limitations of such delegated power would be void. Thus, the validity of gambling regulations rests, in this case, upon the powers vested in the general assembly to authorize those gambling activities referred to in your inquiry.
The provisions of the Colorado Constitution provide one source of limitation upon the powers of the general assembly. Any statute repugnant to the constitution is invalid because the constitution is the paramount law of this state. Garcia v. District Courtof the City and County of Denver, 157 Colo. 432, 403 P.2d 215
(1965).
In construing the meaning of a statute, however, courts will presume that compliance with the Colorado Constitution is intended. C.R.S. 1973, 2-4-201(1)(a). Consequently, when a statute may be interpreted in several ways, the interpretation rendering the statute constitutional must be adopted. Dupreyv. Anderson, 184 Colo. 70, 518 P.2d 807 (1974); Zabav. Motor Vehicle Division, 183 Colo. 335, 516 P.2d 634 (1973).
C.R.S. 1973, 12-47-128(5)(n), as amended, unambiguously legalizes "gambling" when conducted by a charitable organization in accordance with statutory criteria. The statute does not limit the types of "gambling" which it authorizes; but, the Colorado Constitution does provide restrictions on the types of gambling which the legislature may authorize. Accordingly, the term "gambling" in the statute must be interpreted so as not to contravene constitutional limitations.
Constitutional limitations are provided by article XVIII, section2 of the Colorado Constitution. Article XVIII, section 2 was part of the Colorado Constitution as adopted in 1876. At that time, article XVIII, section 2 read as follows:
 Section 2. Lotteries prohibited. — The general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state.
Article XVIII, section 2 was amended in 1958 and again in 1980, and currently reads in pertinent part, as follows:
 Section 2. Lotteries prohibited — exceptions. (1) The general assembly shall have no power to authorize lotteries for any purpose; except that the conducting of such games of chance as provided in subsections (2) to (4) of this section shall be lawful on and after January 1, 1959, and the conducting of state-supervised lotteries pursuant to subsection (7) of this section shall be lawful on and after January 1, 1981.
This provision provides a general prohibition against the authorization of lotteries for any purpose, with specific exceptions contained in subsections (2) to (4) and subsection (7). Subsections (2) to (4) were added by the 1958 amendment to article XVIII, section 2 and are not applicable to your opinion request.[2] Subsection (7), added by the 1980 amendment, also does not apply to the question under consideration in this opinion.[3]
Since article XVIII, section 2, prohibits the general assembly from authorizing lotteries for any purpose, and since the exceptions to this prohibition are not applicable here, the scope of legislative authorization of gambling under section 12-47-128(5)(n) must be examined in light of the constitutional prohibition. The legislature may authorize gambling, but it may not authorize that form of gambling which constitutes a lottery.
The term "gambling" is broader than and includes within its scope "lotteries." As the Colorado Supreme Court stated inGinsberg v. Centennial Turf Club, 126 Colo. 471, 477,251 P.2d 926, 929 (1952):
 It unquestionably is true that all lotteries . . . are forms of gambling, but it does not follow that all gambling is a "lottery" or "gift enterprise," as those terms are defined in law.
What constitutes a lottery has historically been the subject of much litigation. In Colorado, the supreme court has adopted the following definition of lottery:
 Our cases have established that a lottery is present when consideration is paid for the opportunity to win a prize awarded by chance.
In re Interrogatories of Governor Regarding SweepstakesRaces Act, 196 Colo. 353, 356, 585 P.2d 595, 598 (1978). Stated another way,
 It is well settled that a "lottery" proscribed in either a state constitution or statute is defined as a scheme or a plan having three essential elements: consideration, chance, and prize. . . . If all of the elements are present, the scheme is a lottery, regardless of the purpose of its sponsor.
Roberts v. Communications Investment Club,431 A.2d 1206, 1211 (R. I. 1981) (emphasis added).
Variations in form are immaterial to the determination of whether a particular scheme constitutes a lottery:
 Of course, it is of no importance what the scheme is called; as the courts put it, it is the "game" and not the "name" which counts. Nor is any particular method of operation indispensable to the existence of a lottery. For example, a formal drawing by lot is not needed, although lotteries have often been associated with wheels of chance and drawings by lot, as the very term indicates. . . . In the last analysis, every aspect of the scheme is irrelevant, so long as people are induced to pay consideration for the possibility of receiving a prize distributed by chance.
Note, Contest and the Lottery Law, 45 Harv. L. Rev. 1196, 1200-1201 (1932) (hereinafter cited as Note,Contest). See the following cases, in which the courts have recognized that lotteries come in many different forms: In re Interrogatories of Governor RegardingSweepstakes Races Act, supra (sweepstakes race wagering); Bills v. People, 113 Colo. 326, 157 P.2d 139
(1945) (suit club); The Queen v. Kaka, 8 Haw. 305
(1891) (che fa game); Iris Amusement Corp. v. Kelly,366 Ill. 256, 8 N.E.2d 648 (1937) (bank nights); State v.Nelson, 218 Kan. 439, 502 P.2d 841 (1972) (bingo);Contact, Inc. v. State, 212 Neb. 584, 324 N.W.2d 804
(1982) (pickle cards); State v. Ak-Sar-Ben ExpositionCo., 118 Neb. 851, 226 N.W. 705 (1929) (pari-mutuel horse betting); Hendrix v. McKee, 281 Or. 123, 575 P.2d 134
(1977) (pull tab machines); Fleming v. Bills, 3 Or. 286
(1871) (dice throwing); Commonwealth v. Laniewski,173 Pa. Super. 245, 98 A.2d 215 (1953) (football pools); Geis v.Continental Oil Co., 29 Utah 2d 452, 511 P.2d 725 (1973) (advertising promotional scheme); State v. ReadersDigest Ass'n., 81 Wn.2d 259, 501 P.2d 290 (1972) (Reader's Digest Sweepstakes); State ex rel. Schillbergv. Safeway Stores, Inc., 75 Wn.2d 339, 450 P.2d 949
(1969) (Safeway bonus bingo); State ex. rel. Evans v.Brotherhood of Friends, 41 Wn.2d 133,247 P.2d 787 (1952) (slot machines); State v. Langford,29 Wn. App. 455, 628 P.2d 829 (1980) (game of quarters);State v. Hudson, 128 W. Va. 655, 37 S.E.2d 553 (1946) (punch boards); Roberts v. Communications InvestmentClub, supra (market pyramid scheme).
Despite the aforementioned authorities the argument has been made, in construing nineteenth century constitutional provisions such as article XVIII, section 2, that only "charter" or "ticket" lotteries, or lotteries with numbers drawn at random, were intended by the framers of the various constitutional prohibitions to be outlawed. This approach has been rejected by one court on the rationale that constitutional provisions prohibiting lotteries must be construed broadly to eliminate the evils of lotteries which, as far back as 1851, were the symbol of commercial gambling enterprises. State v. Nixon,270 Ind. 192, 384 N.E.2d 152 (1979).
In holding slot machines to be lotteries, the supreme court of Washington similarly rejected the argument that its constitutional prohibition on lotteries must be historically constrained to a narrow class of lotteries. The court inState ex rel. Evans v. Brotherhood of Friends,supra 247 P.2d at 796, stated:
 While charter or ticket lotteries constitute a widespread evil — and the draftsmen may have had such clearly in mind — other types and kinds of lotteries did exist in 1889, and prior thereto. As a matter of fact, the courts of this country had been confronted with numerous types of lottery other than the chartered or ticket lotteries prior to the time Art. II, § 24 was drafted and adopted.
The Colorado courts have also embraced a broad construction of the prohibition against lotteries in article XVIII, section 2 of the Colorado Constitution. In Bills v. People,supra, 113 Colo. at 332, 157 P.2d at 142, the court found that the essential evil of lotteries is the cultivation and stimulation of the spirit of gambling. The court in Inre Interrogatories of Governor, supra,196 Colo. at 357, 585 P.2d at 598, explained the intent of the framers of the Colorado Constitution to rid this state of that evil:
 The framers of our constitution prohibited lotteries in the broadest terms at the time Article XVIII, Section 2 was enacted. In so doing, they were seeking to suppress and restrain the spirit of gambling which is cultivated and stimulated by schemes whereby one is induced to hazard his earnings with the hope of large winnings. (Citation omitted). When the framers adopted Article XVIII, Section 2, they extended its prohibitions to all existing legislative power.
There is no room for doubt that in Colorado, the constitutional prohibition against lotteries must be broadly interpreted, and such an interpretation should not be restricted to certain historical classes of lotteries. Accordingly, a determination of whether a particular gambling scheme constitutes a lottery must depend only upon whether the scheme involves the three essential elements of any lottery: prize, chance, and consideration. The type of scheme involved is immaterial.
The payment of money to participate in a scheme for the distribution of prizes clearly constitutes the payment of consideration. See In re Interrogatoriesof Governor, supra, where the court necessarily held the element of consideration to exist upon the purchase of tickets by sweepstakes bettors. See also Cross v.People, 18 Colo. 321, 32 P. 821 (1893); State v.Bissing, 178 Kan. 111, 283 P.2d 418 (1955).
The "prize" awarded to a participant may similarly consist of money, or any valuable property. In re Interrogatories ofGovernor, supra (money prize); Cross v.People, supra (piano); Bills v. People,supra (men's suit); and Society Theatre v. City ofSeattle, 118 Wn. 258, 203 P. 21 (1922) (groceries). In short, the awarding of anything of value will satisfy this element of a lottery.
Most litigation concerning lotteries, however, has involved the third element: chance. In determining whether the element of chance is present within the meaning of constitutional and statutory provisions relating to lotteries, courts have adopted two distinct approaches. Certain jurisdictions have embraced the "pure chance" doctrine. Under this approach, for a scheme to be a lottery, it must be one solely based on chance. The exercise of any skill by a participant in the scheme removes the scheme from within the definition of a lottery. Braddock v. FamilyFinance Corp., 95 Idaho 256, 506 P.2d 824 (1973).
The majority of courts, however, have adopted the "dominant factor" doctrine under which a scheme is a lottery when chance dominates the distribution of prizes, even though the distribution is affected to some extent by the exercise of skill or judgment. Roberts v. Communications Inv. Club,supra, 431 A.2d at 1211.
Colorado has adopted the majority or "dominant factor" doctrine: "Article XVIII, Section 2 is violated if chance is the controlling factor in the award." In re Interrogatories ofGovernor, supra, 196 Colo. at 356,585 P.2d at 598.
To determine whether chance is the dominant factor in a scheme, the courts and commentators have utilized a variety of tests. One court has stated:
 Chance within the lottery statute is one which dominates over skill or judgment. The measure is a qualitative one; that is, the chance must be an integral part which influences the result.
Sherwood Roberts-Yakima, Inc. v. Leach, 67 Wn.2d 630, 409 P.2d 160, 163 (1965).
In an extensive analysis of the "dominant factor" doctrine the supreme court of Alaska, in Morrow v. State, 511 P.2d 127
(Alaska 1973), set forth a four-part test to determine whether skill dominates over chance: 1) whether without skill it would be impossible to win the game; 2) whether the general public, not experts, have the capacity to solve the problems presented; 3) skill must control the final result, not just one part of the larger scheme — where skill does not destroy the dominant effect of chance, the scheme is a lottery and 4) the participants must be informed of the criteria used in selecting winners.
Utilizing the tests set forth above, it is necessary to examine each of the specific games set forth in your letter of inquiry to determine whether any or all of the games contain the necessary elements of a lottery. A description of each of the games is appended to the June 1, 1983 letter of Marvin Eller. With respect to all of the games, twenty-one, roulette, craps, chuck-a-luck, slot machines, and poker, players pay money to participate and win money when successful. All the games in question therefore contain two of the elements of a lottery: consideration and a prize.[4]
The games roulette, craps, chuck-a-luck, and slot machines also clearly contain the element of chance. In these games, the participant exercises no skill whatsoever but merely pulls a lever or selects the number which he or she believes will be lucky. These games fall into the class of lotteries where prizes are distributed solely by chance. See Note,Contest, supra at 1218.
The game of twenty-one presents a situation where both skill and chance are present. The participant in blackjack must determine whether to play the cards dealt to him, or whether to take another card, a "hit." In making this decision the player must necessarily consider the card or cards shown by the dealer, as well as the player's chances of improving his own hand without exceeding twenty-one, or "busting." Other decisions which must be made by the player include: whether or not to double his bet by "doubling down"; whether to "split pairs" in certain situations; and whether to buy "insurance" from the dealer under certain circumstances. It seems clear from this analysis that skillful twenty-one players have a better chance to win than players with little skill.
On the other hand, the game of twenty-one also involves much chance or luck. Players with little or no skill may be dealt a "blackjack" hand, in which case they win automatically. Players may also win by doing nothing, where the dealer takes a mandatory "hit" and "busts." Even the most skilled player may, himself, take a judicious "hit" and lose by exceeding the total of twenty-one. The skill of a particular player, while perhaps increasing his odds of winning, does not control the final result in twenty-one. That result is the product of the random distribution of the cards. In addition, the players do not know the distribution of the cards in the deck or "shoe."
Arguably, expert "card-counters" can consistently win at twenty-one. This they do by keeping track of cards previously dealt from the deck. This method greatly increases knowledge of what cards remain in the deck and influences the decision of the player to stay or take a "hit." However, the classification of twenty-one as dominated by chance or skill does not turn on the possibility that experts may have an advantage at playing. Morrow v.State, supra. Indeed, even an expert "card-counter" can only increase his odds of winning; he cannot know for certain that he will be successful on any particular hand played. Skill at twenty-one is an intermediate factor in the overall scheme; chance determines the final outcome.
Accordingly, I conclude that the game of twenty-one is dominated or controlled by chance. Twenty-one is therefore a lottery, as it involves the three elements of consideration, prize, and chance.
With respect to poker, the element of chance is not the controlling factor in determining the winner. Players at poker exercise substantial skill in betting, exchanging cards, and bluffing. Chance does determine the distribution of the cards; but, unlike twenty-one, there are usually no automatic winners or losers. The players must make their own decisions to stay in the game by calling or raising, or to drop out when it appears they will be unsuccessful. Because poker involves such substantial skill, it is not a lottery. State v. Coats, 158 Or. 122, 74 P.2d 1102, 1106 (1938). As the court stated inGinsberg v. Centennial Turf Club, supra,126 Colo. at 477, 251 P.2d at 929: "No one would contend that a game of poker . . . constitutes a lottery, but it most certainly is a form of gambling."
The above conclusions bear upon the proper interpretation of the authorization of charitable "gambling" pursuant to section 12-47-128(5)(n). The legislature is powerless to authorize lotteries; the authorization of gambling pursuant to section 12-47-128(5)(n) must therefore be read to exclude all gambling which constitutes lotteries. This interpretation is proper as it harmonizes the statute with the constitution and does not invalidate the work of the legislative branch of government. Ginsberg v.Centennial Turf Club, supra, 251 P.2d at 929.
It follows that since twenty-one, craps, roulette, chuck-a-luck, and slot machines are lotteries for constitutional purposes, the legislature did not, and could not, authorize these activities under section 12-47-128(5)(n). Any regulation which authorized these activities would, therefore, exceed the scope of the legislative power delegated to the state licensing authority. Authorization of poker, on the other hand, would not transgress either the statutory delegation of legislative power or the limitations of that power provided by article XVIII, section 2 of the Colorado Constitution.
SUMMARY
The state licensing authority may by regulation authorize charitable organizations to conduct poker games pursuant to C.R.S. 1973, 12-47-128(5)(n). Twenty-one, craps, roulette, chuck-a-luck, and slot machines are lotteries which may not, consistent with article XVIII, section 2 of the constitution of Colorado, be authorized.
In rendering this opinion, I am not unmindful of its impact on a growing public perception that so-called "charitable casino gambling" (with all of its associated games) is permitted in this state. However, a thorough review of the constitutional and legislative history underlying this perception and the case law surrounding the definition of "lotteries" justifies no other legal conclusion. Indeed, this opinion should serve to underscore the basic principle that in a democratic society important public policy decisions, such as legalized gambling, should be resolved forthrightly within the proper legal or legislative forum. In this case, the proper forum is the People of the State of Colorado through their right to vote on an amendment to article XVIII, § 2 of the Colorado Constitution. Unless and until there is such an amendment approved by the voters, this office will apply only the interpretive criteria discussed above (prize, consideration and chance) to determine the scope of constitutionally permissible gambling activities which may be authorized by the state.
Very truly yours,
 DUANE WOODARD Attorney General
GAMBLING CHARITABLE ORGANIZATIONS RULES AND REGULATIONS
C.R.S. 1973, 12-47-128(5)(n)
C.R.S. 1973, 12-9-101 et seq.
Colo. Const. art. XVIII, § 2
REVENUE, DEPT. of LIQUOR ENFORCEMENT
State licensing authority (Department of Revenue) may not authorize charitable organizations pursuant to C.R.S. 1973, 12-47-128(5)(n) to conduct the following games: craps, roulette, chuck-a-luck, slot machines, or twenty-one; but may, consistent with article XVIII, section 2, authorize the play of poker.
[1] In 1981, section 12-47-128(5)(n) was amended. Prior to the 1981 amendment, only organizations described in section 501(c)(3) of the Internal Revenue Code of 1954, as amended, which would qualify for a license to conduct games of chance under section12-9-104, were authorized to conduct gambling. The 1981 amendment expanded the list of organizations so authorized to include organizations described in sections 501(c)3, 4, 5, 6, 7 or 8 of the code, or organizations which would qualify under section12-9-104. Such organizations may include, among others: community chests; horticultural organizations; football leagues; recreational clubs; and real-estate boards.
Not all these organizations are necessarily "charitable" in nature; however, I interpret your request about the permissible scope of "charitable gambling" as including all qualified organizations under section 12-47-128(5)(n). Any reference in this opinion to "charitable" organizations or gambling, therefore, is a reference to the gambling authorized pursuant to section 12-47-128(5)(n) to be conducted by any organization qualified under that section.
[2] Subsections (2) to (4) apply only to a restricted group of qualified organizations and confine permissible gambling activities to bingo, lotto, and raffles. These gambling activities are subject to extensive regulation pursuant to C.R.S. 1973, 12-9-101 et seq., as amended (bingo and raffles law). Your inquiry letter instead concerns the broader authority to authorize charitable gambling under C.R.S. 1973, 12-47-128(5)(n), as amended.
[3] The constitutional authority for a state-supervised lottery contained in subsection (7) applies only to a state-run and state-operated lottery. See discussions of the House Committee on State Affairs on April 10, 1979 concerning the resolution to place on the ballot the constitutional amendment authorizing a state-supervised lottery (remarks by Representative Randolph). See also discussions of the Senate Committee on State Affairs on May 21, 1979, concerning the same proposed constitutional amendment. Clearly, the legislature itself has interpreted subsection (7) as authorizing a state-run lottery, evidenced by the enactment of C.R.S. 1973, 24-35-201 et seq., as amended (establishing the Colorado lottery).
[4] This result does not change when prizes are awarded instead of money. So long as the prize consists of anything of value, the "prize" requirement of a lottery is fulfilled.