Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 24, 2017

2017 CO 36

**No. 14SC304, <u>Martinez v. People</u>—Testimonial Evidence—Electronic Exhibits—Jury Deliberations—Plain Error.**

In this case, the supreme court reviews for plain error a trial court's decision to allow the jury unfettered access, during its deliberations, to the out-of-court statements of three sexual assault victims. These statements were memorialized in three DVDs and three transcripts thereof, all of which had been admitted as exhibits in the petitioner's criminal trial.

The supreme court now concludes that even if the trial court erred in allowing the jury unfettered access to the victims' statements, on the facts of this case, any such error did not so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the petitioner's convictions and, thus, was not plain.

Accordingly, the court affirms the judgment of the court of appeals division and remands the case to that court for further proceedings consistent with the opinion.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 36

### Supreme Court Case No. 14SC304
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 10CA1840

#### Petitioner:

Nerio Martinez,

v.

#### Respondent:

The People of the State of Colorado.

### Judgment Affirmed
*en banc*
April 24, 2017

**Attorneys for Petitioner:**
Douglas K. Wilson, Public Defender
Ned R. Jaeckle, Deputy Public Defender
  *Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
Ethan E. Zweig, Assistant Attorney General
  *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE BOATRIGHT** concurs in part and concurs in the judgment.

¶1 In this case, we review for plain error a trial court's decision to allow the jury unfettered access, during its deliberations, to the out-of-court statements of three child sexual assault victims. These statements were memorialized in three DVDs and three transcripts thereof, all of which had been admitted as exhibits in the criminal trial of the petitioner, Nerio Martinez.[1] Martinez first raised the issue of jury access on direct appeal, arguing that allowing the jury unfettered access constituted reversible plain error. In a unanimous, unpublished opinion, a division of the court of appeals rejected this argument. People v. Martinez, No. 10CA1840, slip op. at 14 (Colo. App. Mar. 13, 2014). Without deciding whether the trial court had abused its discretion, the division concluded that any error in not limiting the jury's access to the exhibits during deliberations did not warrant reversal under the plain error standard.

¶2 We agree and therefore affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶3 Martinez began dating the victims' mother in April 2004, when the victims, three sisters, were approximately 7, 8, and 11 years old. Within three months, the victims and their mother had moved in with Martinez. Soon after that, the couple bought a house, and they married the next year. Martinez's repeated cheating, however, led to a

---

[1] We granted certiorari to review the following issue:

> Whether the court of appeals erred in holding that the trial court did not plainly err by allowing the jury unfettered and unsupervised access to transcripts and videotapes of the alleged victims' forensic interviews during its deliberations.

tumultuous marriage. Over the course of five years and six different homes, the couple split up, reconciled, had a son, split up again, reconciled again, and ultimately divorced.

¶4 While divorce proceedings were pending in June 2009, allegations surfaced that Martinez had repeatedly sexually abused all three of his stepdaughters.[2] When the girls' mother learned of these allegations, she immediately called the police, who set up forensic interviews for the girls a few days later. In the interviews, all three sisters accused Martinez of similar acts of abuse, with the oldest sister describing five separate incidents between 2004 and 2007, the middle sister describing five incidents between 2005 and 2009, and the youngest sister describing seven incidents that occurred in a house to which the family had moved in 2008.

¶5 The police interviewed additional witnesses, including Martinez himself, and gathered what they could in the way of physical evidence. They ultimately retrieved, among other things, a semen-stained blanket, pornographic images and videos (including videos from teenage pornography websites), and a photo of one of the victims in her underwear. The police subsequently arrested Martinez.

¶6 In a seventy-count complaint and information, the People alleged that Martinez had sexually abused his three stepdaughters on seventeen separate occasions between September 2004 and January 2009. The seventy charges comprised seventeen counts of sexual assault on a child, seventeen counts of sexual assault on a child by one in a position of trust, seventeen counts of aggravated incest, fourteen counts of sexual

---

[2] The girls' mother testified that Martinez never formally adopted the girls, but they lived as a family and he acted as their parent.

3

assault on a child by one in a position of trust as part of a pattern of abuse, and five habitual criminal sentence enhancers. Martinez pleaded not guilty, and in May 2010, the case proceeded to a week-long trial.

¶7 The prosecution's case-in-chief lasted four days and included nineteen witnesses (but little physical evidence). As pertinent here, the forensic interviewer took the stand on the first day of testimony, before any of the victims. She described the forensic interviews that she had conducted with the victims and authenticated the DVD and the transcript of each interview. The prosecutor then offered and the court admitted into evidence the three DVDs and the three transcripts.

¶8 Thereafter, the prosecutor published the DVDs and the transcripts of the interviews, providing copies of the pertinent interview transcript for the jurors to read while each DVD played in open court.[3] The prosecutor then called each victim and elicited her testimony regarding the charged incidents related to her.

¶9 For the most part, the victims' trial testimony paralleled their out-of-court interviews. In both settings, the victims attributed their delayed outcries to their fears as to what might happen, including ending up in court, and their concern that their little brother—Martinez's biological son—would grow up without a father. Moreover, although the victims could not remember certain details, they had not forgotten any

---

[3] When the prosecutor proposed to proceed in this fashion, Martinez objected in part. Although he conceded that "the transcript has already been admitted into evidence, so at this point . . . it could be published," he opposed including the copies of the transcripts in the juror notebooks because, unlike the originals, the copies were not evidence. When the court suggested that the bailiff collect the copies at each DVD's conclusion, however, Martinez responded, "That's fine."

4

salient aspects of the charged crimes since providing their out-of-court statements. For example, although the oldest stepdaughter testified that parts of her memory were "blocked" with respect to the first time that Martinez had touched her, she remembered in detail the pertinent facts of this incident, and her description matched the description that she gave in her forensic interview. Specifically, in both contexts, she recalled that (1) the incident had occurred in a blue truck driven by Martinez, (2) the two had been on their way to the grocery store, (3) Martinez had begun tickling her, (4) he then put his hands down her pants and his fingers in her vagina, and (5) the incident ended with him putting her hands down his pants to show her his "ticklish spot" and to have her touch his penis. She also recalled Martinez's saying, "It tends to get messy."

¶10    In addition, the victims' accounts were supported by (1) the testimony of four friends in whom the girls had confided regarding the abuse as early as four years before trial and (2) one of the friends' mothers, who had notified the victims' mother after learning of the alleged abuse. The friend's mother testified that she had helped the victims' mother confront the victims about the abuse, and her testimony generally corroborated the victims' mother's account of that episode.

¶11    For his part, Martinez maintained that the victims had fabricated the allegations because they were angry that he had repeatedly cheated on their mother. Thus, when the prosecutor asked him why the victims would invent such allegations, Martinez replied, "Just to hurt me for what I've done to their mom."

¶12    Martinez also suggested that the girls had financial reasons to retaliate against him, testifying that until he left them, his income alone had supported the family. To

this end, on cross-examination, defense counsel elicited testimony from the victims that when Martinez and their mother were together, Martinez spoiled the girls. Similarly, Martinez's goddaughter testified that the victims were "really mad" at Martinez when they learned that he had cheated on their mother, that they grew "even more mad" when their mother reconciled with him, and that they "were going to do whatever they could to get [Martinez] to get them whatever they wanted."

¶13 In the closing arguments that followed, both sides recognized the paramount importance of the victims' credibility—particularly in relation to their motives—to the resolution of the case. As pertinent here, the prosecutor began his argument by urging the jurors "to harken back to when you first saw the [DVDs] of each of those girls on those consecutive days, and I want you to think about your reaction[—]that first gut reaction[—]to how those girls came across." He then went over the timeline of the case and challenged Martinez's theory of defense, contending that the record lacked any evidence "that these children would have the kind of animosity, the kind of viciousness to go after [Martinez] in 2009 when they were one week away from getting completely separated from him legally through the divorce of the parties."

¶14 Defense counsel, in turn, began his closing argument by paraphrasing Martinez's trial testimony: "They hurt me for what I did to their mom." Counsel also acknowledged that the case reduced to a credibility determination, stating, "What we have is credibility of witnesses, and that's your job to make a determination based on all the evidence," including the forensic interviews, which "you'll have an opportunity to review . . . again during your deliberation." He urged the jury to find that certain

6

statements to which the victims had testified (e.g., "I don't want [Martinez] dead. I want him to suffer.") indicated that the victims had fabricated the allegations to retaliate against Martinez for causing their mother to suffer. He expressly declined, however, "to go over a lot of detail about all the different allegations."

¶15 The case then went to the jury, and although the record suggests that the court intended that all of the exhibits—including the transcripts and DVDs at issue—be sent into the jury room, the parties dispute whether that room contained the equipment necessary to play the DVDs.[4] We need not resolve this dispute, however, because as discussed more fully below, the jury's ability to watch the DVDs does not affect our conclusion in this case.

¶16 The jury ultimately returned verdicts finding Martinez guilty as charged of the sixty-five substantive counts. Two months later, the court held a hearing on the habitual offender counts, found that Martinez had been convicted in five prior felony cases, and entered judgments of conviction on all five habitual offender counts. At the same hearing, the court sentenced Martinez to an aggregate term of 192-years-to-life in prison.

¶17 Martinez appealed his convictions and sentence. As pertinent here, he argued that the trial court had abused its discretion in failing to control the jury's use of the interview transcripts and DVDs. Although he admitted that he had not objected to the jury's having unfettered access to those materials, he contended that the error was

---

[4] As the division below observed, "[T]he record does not confirm that the jury had the equipment necessary to view the video exhibits. The record confirms only that the jury had the written transcripts of the interviews." Martinez, slip op. at 13 n.1.

7

obvious, affected the fundamental fairness of the trial, and cast serious doubt on the reliability of the guilty verdict, thus establishing reversible plain error.

¶18    The division declined to address the question of whether the trial court had abused its discretion by not exercising some control over the exhibits at issue.  Martinez, slip op. at 8.  Instead, as pertinent here, the division concluded that even if the trial court had abused its discretion, any resulting error did not so impair the reliability of Martinez's convictions as to constitute reversible plain error.  See id. at 8, 14.  The division thus affirmed the judgment. Id. at 24.[5]

¶19    Martinez then filed a certiorari petition, asking this court to review the division's conclusion that the trial court did not commit reversible plain error when it allowed the jury unsupervised access to the transcripts and DVDs of the victims' forensic interviews.  We granted the petition, and for the reasons set forth below, we now affirm the division's judgment.

## II.  Analysis

¶20    It is undisputed that Martinez did not object when the trial court allowed the jury unfettered access to the victims' interview transcripts and DVDs during deliberations.  In these circumstances, Crim. P. 52(b) limits our review to "[p]lain errors

---

[5] Although the division rejected Martinez's challenges to his convictions, it agreed with his contention that the sentencing court had erred in applying the extraordinary risk statute, § 18-1.3-401(10)(a), C.R.S. (2016), to his convictions for sexual assault on a child by one in a position of trust as part of a pattern of abuse.  Martinez, slip op. at 22–23. The division therefore vacated the erroneous sentences and remanded the case for resentencing.  Id. at 24.  From the available record, it is unclear whether this resentencing has yet occurred.

or defects affecting substantial rights." Martinez contends that the trial court's error in purportedly not exercising its discretion regarding the DVDs and transcripts was plain and requires reversal. We are not persuaded.

¶21 We begin by explaining how the plain error standard shapes our review of Martinez's claim. Next, we apply that standard to determine whether the error that Martinez has asserted warrants the reversal of his convictions.

## A. Plain Error

¶22 Control over the use of exhibits during jury deliberations rests firmly within the trial court's discretion, and we may not substitute our own judgment for that of the trial court merely because we would have reached a different conclusion. People v. Jefferson, 2017 CO 35, ¶ 25, ___ P.3d ___; DeBella v. People, 233 P.3d 664, 666–67 (Colo. 2010). Accordingly, we review for an abuse of discretion the court's decision to grant the jury access to the transcripts and DVDs of the victims' forensic interviews, and we will not disturb that decision unless it was manifestly arbitrary, unreasonable, or unfair. See Jefferson, ¶ 25; DeBella, 233 P.3d at 667.

¶23 Not every abuse of discretion, however, impairs the reliability of a conviction to a degree that requires reversal. Jefferson, ¶ 26; DeBella, 233 P.3d at 667. When, as here, no contemporaneous objection preserved the error, Crim. P. 52(b)'s plain error standard governs appellate review, and we may correct the error only if it meets that rule's criteria. See Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); accord Hagos v. People, 2012 CO 63, ¶ 14, 288 P.3d 116, 120.

9

¶24 Crim. P. 52(b)'s plain error standard addresses error that is both obvious and substantial and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. People v. Miller, 113 P.3d 743, 750 (Colo. 2005).

## B. Application

¶25 For the purposes of this opinion, we need not decide whether the trial court abused its discretion in granting the jury apparently unlimited access to the transcripts and, possibly, the DVDs of the victims' forensic interviews. Nor need we decide whether the resulting error was obvious and substantial. Assuming without deciding both that the trial court abused its discretion and that, in doing so, it committed an obvious and substantial error, we still perceive no grounds for reversal because as we proceed to discuss, we cannot say that any error here so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. See id.

¶26 "In this jurisdiction we have long adhered to the rule that absent a specific exclusion of some particular class of exhibits, trial courts exercise discretionary control over jury access to trial exhibits during their deliberations." Jefferson, ¶ 29 (quoting Frasco v. People, 165 P.3d 701, 704 (Colo. 2007)); see also Settle v. People, 504 P.2d 680, 680–81 (Colo. 1972) (applying the rule of discretionary control to the reading of part of the testimony of trial witnesses); Wilson v. People, 84 P.2d 463, 467 (Colo. 1938) (noting that in the absence of prohibitory legislation, it is within the trial judge's discretion to permit papers not under seal to be sent to the jury room).

10

¶27 Granting the jury access to portions of trial testimony (as in <u>Settle</u>) or to exhibits substituting for trial testimony (as in <u>Frasco</u>, <u>DeBella</u>, and <u>Jefferson</u>, all of which involved the videotaped, out-of-court statements of child sexual assault victims), however, may pose a risk that jurors will place undue weight or emphasis on that evidence. Accordingly, trial courts in criminal proceedings bear an obligation to ensure that juries do not use such exhibits in a manner that is unfairly prejudicial to either party. <u>Frasco</u>, 165 P.3d at 704. The precise procedure to be followed to ensure this result, however, lies within the court's sound discretion. <u>Id.</u>

¶28 We have twice discerned reversible error in trial courts' decisions to grant juries unfettered access to exhibits containing the out-of-court statements of child victims of sexual assault. <u>See</u> <u>Jefferson</u>, ¶¶ 2–3; <u>DeBella</u>, 233 P.3d at 669. In each of those cases, we noted the substantial risk that the jury had placed undue weight or emphasis on the videotape because (1) the victim's trial testimony and out-of-court statement contradicted each other, which underscored how much the resolution of the case hinged on assessing the victim's credibility, and (2) insofar as the videotape contained the only complete recounting of the assaults, it likely served as "the linchpin of the prosecution's case." <u>Jefferson</u>, ¶ 59; <u>DeBella</u>, 233 P.3d at 668–69. We further observed that because the victim's credibility was central to the resolution of each of those cases, providing the jury with unsupervised access to only one side of the story (namely, the prosecution's) unacceptably heightened the risk of an unfair trial. <u>See</u> <u>Jefferson</u>, ¶ 45; <u>DeBella</u>, 233 P.3d at 669.

¶29    For several reasons, the circumstances in this case do not present the same likelihood that in the course of its deliberations, the jury placed undue weight or emphasis on the victims' out-of-court interviews.  Nor do we perceive a material risk to the fairness of Martinez's trial.

¶30    First, although inconsistencies between a victim's recorded statement and his or her account at trial are "almost always present" in cases involving charges of sexual assault on a child, DeBella, 233 P.3d at 669, Martinez's defense did not rely to any significant extent on such inconsistencies to challenge the victims' credibility in the present case.  Rather, he focused his defense on the victims' purported motive to invent the allegations against him in retaliation for his extramarital affairs.  Indeed, during his closing argument, Martinez underscored only one inconsistency: when in her trial testimony, the youngest stepdaughter described one of the charged incidents, she stated that Martinez had been touching her under his "Bronco blanket" when a knock at the door interrupted them.  Describing the same incident in her forensic interview, however, this victim did not mention any knock at the door but said that the incident ended after "weird stuff c[a]me out of [Martinez's] penis."  Discussion of this inconsistency, however, made up only a small portion of a closing argument that began and ended by emphasizing that the victims had not been truthful because "at the end of the day, all they wanted to do was hurt [Martinez] like [Martinez] had hurt their mother."

¶31    Martinez's approach thus stands in stark contrast to the defenses asserted in Jefferson and DeBella, which relied on discrepancies between the victims' trial

12

testimony and their videotaped interviews to establish that the victims were not credible. Jefferson, ¶ 59; DeBella, 233 P.3d at 669. In those cases, the jurors' unlimited access in the jury room to only one side of the story heightened the risk that they would give that side undue weight, while at the same time, their memories of the victims' in-court and sometimes contradictory testimony faded. See Jefferson, ¶ 60 ("With unfettered access to the DVD during its deliberations, the jury was able to watch and re-watch [the victim] describe the abuse in a manner functionally equivalent to her live testimony, except with more—and more vivid—detail."); DeBella, 233 P.3d at 669 ("Allowing the jury to pore over the [video]tape only marginally facilitated a comparison between that exhibit and the victim's trial testimony, of which jury members only had their memory.").

¶32 In sum, because Martinez did not base his defense on inconsistencies between the victims' in-court and out-of-court accounts (perhaps due to the fact that those accounts were largely consistent), unlimited access to the forensic interviews neither impeded the jury's assessment of Martinez's theory of defense nor unduly emphasized the prosecution's version of events.

¶33 Second, unlike in Jefferson and DeBella, the victims' interviews did not serve as "the linchpin of the prosecution's case" against Martinez. In Jefferson and DeBella, the victims had provided more complete accounts of the crimes in their out-of-court interviews than in their trial testimony. See DeBella, 233 P.3d at 669 ("[A]s the only complete recounting of the assaults, the videotape was the linchpin of the prosecution's case against [the defendant]."); see also Jefferson, ¶ 59 ("[T]he DVD, which contained

13

details that [the victim] could not remember when she testified, likely served as the 'linchpin of the prosecution's case,' just as the videotape in DeBella did."). In Jefferson, ¶ 11, for example, the victim had been able to describe the alleged assault in some detail in an out-of-court interview. When asked to recount the same events at trial, however, she often replied, "I don't know" or "I don't remember." Id. at ¶ 13. Similarly, in DeBella, 233 P.3d at 668–69, the videotape of the victim's forensic interview contained a detailed account of the sexual assaults and included aspects of the assaults that the victim could not remember at trial. The out-of-court interviews in Jefferson and DeBella thus filled gaps in the victims' trial testimony, likely leading the jury to accord the interviews undue significance during its deliberations. See Jefferson, ¶ 59; DeBella, 233 P.3d at 669.

¶34 Here, in contrast, the victims provided similarly detailed accounts both in their out-of-court interviews and in their trial testimony. See supra ¶ 9. For instance, the middle sister recounted the first of five charged incidents using nearly identical language both at trial and during her out-of-court interview. She explained that she had been getting ready for bed when Martinez came into her room and started to tickle her. He then got into her bed and under the covers with her, kissed her for a long time, touched her "boobs" (she said "breast" at trial), and "st[u]ck" (she said "put" at trial) his fingers in her vagina. She also used the same language to describe her perception of Martinez's ejaculating, stating that she felt something come out of his penis and that it "felt kind of like milk." And because this victim, as well as her sisters, provided a similar level of detail both in her interview and in her trial testimony, none of the

14

interviews (whether in DVD or transcript form) went into the jury room as the most detailed version of events or the "linchpin" of the prosecution's case. Cf. Jefferson, ¶ 60.

¶35 We are not persuaded otherwise by Martinez's assertion that on several occasions at trial, at least two of the victims testified that they did not remember certain things. These forgotten details were minor at best and did not concern any critical details of the assaults. For example, the oldest victim had stated in her out-of-court interview that when she and Martinez returned home from the trip to the grocery store during which Martinez had first assaulted her, he had explained their delayed return by saying, "There was a long line." At trial, however, when the prosecutor asked this victim whether she or Martinez had explained "why it took so long," she answered, "I don't remember." Neither the absence of such details from the victims' trial testimony nor their presence in the victims' interviews leaves us with the same concern regarding gap-filling that we described in Jefferson and DeBella.

¶36 We likewise are unpersuaded by Martinez's attempt to measure quantitatively the gap-filling role that the interviews played here by dividing the number of lines in the transcripts of the interviews by the number of lines in the transcripts of the victims' trial testimony (which Martinez asserts yields a ratio of about four-to-one). This method ignores the content of both the interviews and the testimony, providing an ineffective means for assessing whether the interviews actually supplied details of the charged crimes that the victims' testimony lacked. Cf. Jefferson, ¶ 59. Martinez does not specifically identify any such details, and our review of the record has turned up

none that would render the interviews "the only complete recounting of the assaults." DeBella, 233 P.3d at 669.

¶37    Third, we observe that not only did Martinez not object to the jury's unfettered access to the victims' interviews, but also he affirmatively suggested that the jurors review those interviews while they deliberated. Specifically, in his closing argument, Martinez's counsel noted the limited nature of the physical evidence in this case and emphasized that what the jurors had were the forensic interviews, which, he said, the jurors would "have an opportunity to review . . . again during [their] deliberation." Such a statement, particularly when coupled with the fact that counsel did not object to the jury's unfettered access to the interviews, suggests that Martinez may not have viewed the jury's access to the victims' interviews during its deliberations as harmful to his interests. Cf. Frasco, 165 P.3d at 705 (remarking that defense counsel "specifically asked the jury, if it went through the videotape during deliberations, to take note of the suggestiveness of the questioning in that interview" and concluding, as a result, that "it is not even clear that defense counsel considered granting the jury access to the videotape to be disadvantageous").

¶38    Finally, the strength of the prosecution's case against Martinez mitigates any doubt about the reliability of the jury's verdicts as a result of the jury's unfettered access to the out-of-court interviews. Cf. Martinez v. People, 2015 CO 16, ¶ 16, 344 P.3d 862, 868 (reasoning that an erroneous instruction regarding a given element of the crime charged does not rise to the level of plain error "[i]f the record contains overwhelming evidence" of that element). The victims' accounts were consistent, both internally and

16

over time, and were supported by testimony from five hearsay witnesses who said that the victims had revealed the abuse long before the divorce or the police investigation, thereby undercutting Martinez's argument that the victims invented the abuse after Martinez had cheated on their mother. Cf. Jefferson, ¶ 59 (expressing concern regarding the fairness of the proceedings, given that the prosecution's case rested on the victim's allegations, "which were at times inconsistent and which were supported only by hearsay testimony from her family and government investigators").

¶39 Moreover, although the case involved relatively limited physical evidence, some of which was arguably equivocal (e.g., the semen-stained blanket collected from Martinez months after he had moved out and begun another sexual relationship), all of the evidence fit the prosecution's theory of the case. Perhaps most compelling, the police discovered on devices belonging to Martinez a photograph of one of the victims in her underwear and pornographic images and videos (including videos from teenage pornography websites). This evidence tended to support a finding that Martinez had a sexual interest in young girls, including his own stepdaughters, and it also was consistent with the middle sister's allegation that Martinez had her sit on his lap and watch pornography with him on his laptop.

¶40 For all of these reasons, we conclude that the jury did not likely place undue emphasis on the victims' interviews during its deliberations. As a result, we conclude that the jury's unfettered access to those interviews did not so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of Martinez's convictions. See Miller, 113 P.3d at 750.

17

¶41 In reaching this conclusion, we are unpersuaded by Martinez's contention that a greater potential for undue emphasis inheres in videos, such as the DVDs at issue here, than in other media, such as the transcripts that are also at issue.

¶42 We acknowledge, as Martinez suggests, that "[v]ideotape testimony is unique," given that it enables jurors to observe the demeanor and to hear the testimony of witnesses. United States v. Binder, 769 F.2d 595, 600 (9th Cir. 1985), overruled in part on other grounds by United States v. Morales, 108 F.3d 1031, 1035 n.1 (9th Cir. 1997); see also Frasco, 165 P.3d at 705 ("[S]ome kinds of exhibits obviously have a greater potential for unfair prejudice than others."); Martin v. State, 747 P.2d 316, 319 (Okla. Crim. App. 1987) (recognizing the possibility for abuse inherent in "allowing the jury to hear, and see, the entire testimony of an empathetic witness, such as a child describing a painful experience in his young life").

¶43 As noted above, however, on the record before us, it is unclear whether the jurors even had the ability to watch the DVDs in the jury room. And even if they did, given our conclusion that the jury did not likely place undue emphasis on the interviews in the first place, on the facts presented here, we decline to hang a determination of reversible plain error solely on the medium by which those interviews were accessible to the jury.

### III. Conclusion

¶44 For these reasons, we affirm the judgment of the court of appeals and remand this case to that court for further proceedings consistent with this opinion.

**JUSTICE BOATRIGHT** concurs in part and concurs in the judgment.

JUSTICE BOATRIGHT, concurring in part and concurring in the judgment.

¶45     I agree with the majority's assessment that even if we assume the trial court abused its discretion in allowing the jury unsupervised access to the videotape of the forensic interview, such abuse was not plain error and Martinez's conviction should stand. I write separately because I dissent from the majority's opinion in the companion case, People v. Jefferson, 2017 CO 35, ___ P.3d ___, for reasons that I explain there. Hence, to the extent that the majority's analysis in Jefferson undergirds the majority opinion here, I respectfully disagree.