22CA1377 Peo v Lewicke 11-13-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1377
Larimer County District Court No. 21CR169
Honorable Daniel M. McDonald, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Geoffrey James Lewicke,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE TOW
Lipinsky and Grove, JJ., concur

Prior Opinion Announced March 28, 2024, Vacated in 24SC390

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 13, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Levin Jacobson Japha P.C., David C. Japha, Evan J. House, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Geoffrey James Lewicke, appeals his judgment of conviction entered on a jury verdict finding him guilty of attempted second degree murder and several other offenses.

¶ 2    We previously issued an opinion affirming in part and reversing in part. *People v. Lewicke*, (Colo. App. No. 22CA1377, Mar. 28, 2024) (not published pursuant to C.A.R. 35(e)). Specifically, we rejected Lewicke's contentions that several trial errors warranted reversal. But we concluded that the trial court erred with respect to restitution, and we agreed with the parties that the mittimus inaccurately reflected the parole period. Lewicke sought certiorari on one of the trial error contentions (involving a challenge to the prosecutor's voir dire) and the division's resolution of the restitution challenge.

¶ 3    While Lewicke's certiorari petition was pending, the supreme court decided a collection of cases involving restitution-related issues not resolved in *People v. Weeks*, 2021 CO 75: *Johnson v. People*, 2025 CO 29; *People v. Roberson*, 2025 CO 30; *Tennyson v. People*, 2025 CO 31; and *Snow v. People*, 2025 CO 32. Shortly thereafter, the supreme court granted certiorari in this case, vacated our judgment, and remanded for reconsideration in light of

*Johnson, Tennyson*, and *Snow*. *Lewicke v. People*, (Colo. No. 24SC390, Aug. 4, 2025) (unpublished order).

¶ 4 Having reconsidered the matter, we again reject Lewicke's challenges to his conviction. But we vacate the restitution order and remand for entry of an order that no restitution is owed and for correction of the mittimus.[1]

## I. Background

¶ 5 From the evidence presented at trial, a jury could reasonably have found the following.

¶ 6 One evening, Lewicke invited two friends, Jenna Holmstrom-Wetzel and Jessica Delapp, to hang out at his house. They all drank together and consumed cocaine.

¶ 7 According to Delapp, Lewicke had been "getting kind of aggressive" as the night progressed. She was concerned, and eventually she asked Holmstrom-Wetzel to step outside with her and smoke a cigarette.

---

[1] The supreme court's remand instructions pertain only to the restitution issue. Nevertheless, because the supreme court's order vacating our judgment was not restricted or qualified in any way, it effectively abrogated our entire original opinion. So we reiterate our analysis and conclusions on the other issues.

¶ 8    While they were outside, Delapp looked through a window and saw Lewicke "chug[] alcohol" and then turn off the lights and lock the back door. Holmstrom-Wetzel went to the door to ask for her phone and keys, which she had left inside, but Lewicke would not let her in. While Holmstrom-Wetzel was at the back door, Delapp waited further away because she was "terrified." Lewicke then shot through the door, striking Holmstrom-Wetzel in the face, severely injuring her.

¶ 9    Holmstrom-Wetzel and Delapp left and called an ambulance. When police later arrived at Lewicke's house, he had barricaded himself inside. Eventually, the police rammed through his door, and he surrendered. Among the several guns police found in his home was a nine millimeter handgun suspected to have been used against Holmstrom-Wetzel.

¶ 10    Lewicke was charged with attempted first degree murder, among other offenses. At trial, Lewicke testified that he was likely responsible for shooting Holmstrom-Wetzel:

> DEFENSE COUNSEL: Do you have any doubt
> now that you probably are the person that
> hurt her?

3

> LEWICKE: Unfortunately, yeah.  It's not fun finding out you hurt one of your best friends . . . .

> DEFENSE COUNSEL: Do you have any idea how the shot got through the door?

> LEWICKE: It looks like I — looks like I did it, because there was no one else in the house at the time.

However, Lewicke emphasized that he had no reason to want to hurt Holmstrom-Wetzel.  He also reiterated that he had memory issues and that he could not remember the shooting.

¶ 11    The jury found Lewicke guilty of attempted second degree murder, second degree assault, reckless endangerment, and prohibited use of a weapon.

## II.    Trial Issues

¶ 12    Lewicke raises three issues with his trial.  Because none of the issues is preserved, we review them for plain error.  *Hagos v. People*, 2012 CO 63, ¶ 14.  Plain errors are obvious and substantial.  *Id.* For an error to be obvious, it "must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law."  *Scott v. People*, 2017 CO 16, ¶ 16 (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40), *abrogated on other grounds by, Whiteaker v. People*, 2024 CO 25.  Further, we reverse only if the error "so

4

undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 15 (citing *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

¶ 13    Lewicke contends that the trial court erred by not sua sponte (1) correcting the prosecutor's statements on gun control during voir dire; (2) denying the admission of Lewicke's guns into evidence (except for the nine millimeter involved); and (3) correcting the prosecutor's closing argument, which, according to Lewicke, expressed improper opinions and referenced facts not in evidence. We discern no reversible errors.

## A.    Voir Dire Inquiries

¶ 14    Lewicke argues that, during voir dire, the prosecutor improperly asked potential jurors about their feelings on gun control.  We disagree.

¶ 15    The purpose of voir dire is to "allow[] counsel to determine whether any potential jurors possessed any beliefs that would bias them such as to prevent . . . a fair trial." *People v. O'Neill*, 803 P.2d 164, 169 (Colo. 1990).  This is a case involving gun violence, and gun control is a sensitive topic that could improperly influence a juror's reasoning.  Thus, we are not convinced that the trial court

abused its discretion by permitting this line of inquiry. *People v. Flockhart*, 2013 CO 42, ¶ 37 ("[T]he 'propriety of questions to potential jurors on voir dire is within the discretion of the trial court, and its ruling thereon will not be disturbed on appeal unless an abuse of that discretion is shown.'" (quoting *People v. Collins*, 730 P.2d 293, 300 (Colo. 1986))).

¶ 16    In any event, the cases Lewicke cites to support his contention that voir dire was improper and undermined the fairness of his trial are distinguishable. They involve jurors commenting on the credibility of witnesses or on the bad character of a defendant — neither of which occurred here. *See Mach v. Stewart*, 137 F.3d 630, 632, 634 (9th Cir. 1997) (finding prejudice when prospective juror, a social worker for child protective services, said sexual assault had been confirmed whenever a child had made an accusation); *State v. McMahon*, 894 P.2d 313, 316 (Mont. 1995) (finding prejudice when prospective jurors commented on defendant's reputation, and one said she was fearful of him). Moreover, both cases are from other jurisdictions, and thus they fail to establish that permitting this particular inquiry ran afoul of "well-settled legal principle[s]" or "Colorado case law" sufficient to make any error obvious. *Scott*,

¶ 17 ("[A]n error is generally not obvious when nothing in Colorado statutory or prior case law would have alerted the trial court to the error.").

## B. Admission of Multiple Guns

¶ 17 Lewicke next contends that the trial court abused its discretion by admitting into evidence his guns that were not used in the shooting. (Lewicke does not challenge the admission of the gun that was used in the shooting.) We disagree.

¶ 18 Initially, we note that Lewicke again relies largely on case law from other states to argue that the admission of his guns was erroneous. He contends there was no "sufficient nexus" between the guns and the crimes charged, and thus the guns were inadmissible. *See, e.g.*, *People v. Maldonado*, 608 N.E.2d 499, 505 (Ill. App. 1992) (concluding that a weapon may be admitted if there is a sufficient nexus between the weapon and the crime alleged, meaning that there must be a showing that the weapon is "suitable for the crime charged"). But we are aware of no Colorado authority establishing such a narrowly defined "sufficient nexus" requirement for the admission of firearm evidence. To the contrary, under Colorado case law, "although it is not claimed nor proved that the

7

articles introduced in evidence were actually used in the commission of the crime, a weapon or other instrument found in the possession of the accused when arrested has been held admissible as part of the *history of the arrest.*" *Davis v. People*, 321 P.2d 1103, 1105 (Colo. 1958); *see also People v. Watson*, 650 P.2d 1340, 1343 (Colo. App. 1982) (concluding that "weapons found during a search are admissible as a part of the history of the arrest, notwithstanding that there is no evidence that they were used in the commission of the crime" (citing *Hafer v. People*, 492 P.2d 847, 850 (Colo. 1972))).[2]

¶ 19 To the extent Lewicke proffers the "sufficient nexus" argument as a relevancy challenge, we reject it. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

---

[2] We recognize that this line of cases is perhaps a vestige of the res gestae doctrine, which our supreme court has since abolished. *See Rojas v. People*, 2022 CO 8, ¶ 41. But that connection is not entirely clear; notably, *Rojas* did not explicitly overrule or abrogate these cases. Thus, the trial court and we are bound by *Davis v. People*, 321 P.2d 1103 (Colo. 1958). In any event, the fact that these opinions remain undisturbed defeats any claim that admission of the guns was contrary to existing law and thus obvious error.

less probable than it would be without the evidence." CRE 401. The People contend that the guns were relevant to Lewicke's consciousness of guilt. Specifically, the People contend that, when combined with the evidence that Lewicke barricaded himself inside the house after the shooting, a jury could reasonably infer that he knew he had shot Holmstrom-Wetzel and understood the seriousness of his actions — thus refuting his claims of intoxication and lack of memory. The People also assert that the manner in which the guns were found undermined the credibility of Lewicke's statements, made shortly after the incident, regarding his handling and storage of the weapons.[3]

¶ 20    We agree with the People. The evidence of the guns was particularly relevant to Lewicke's credibility, as well as, albeit to a lesser extent, his consciousness of guilt.

¶ 21    Lewicke also challenges the gun evidence under CRE 403. He relies on *People v. Allgier*, 2018 COA 122, ¶ 35, for the notion that

---

[3] At oral argument, the People proffered a third justification: that the arsenal of loaded weapons strewn about the home supported the prosecution's theory of the case that Lewicke shot Holmstrom-Wetzel with the goal of setting up a violent confrontation with police to get himself killed. We do not consider this argument, however, as it was raised too late.

there was "at least some possibility of prejudice" in admitting the guns into evidence. But the *possibility* of prejudice alone does not amount to a CRE 403 violation. Rather, the prejudice must be *unfair* and must substantially outweigh the evidence's probative value. CRE 403. Moreover, "[b]ecause the balance required by CRE 403 favors admission, a reviewing court must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." *People v. Elmarr*, 2015 CO 53, ¶ 44 (quoting *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002)). Thus, even if Lewicke's plethora of firearms could have possibly prejudiced jurors who disliked guns (or, for that matter, jurors who were responsible gun owners), the court did not abuse its discretion by admitting the guns given that they were probative of Lewicke's consciousness of guilt and credibility. *See id.* at ¶ 20 ("Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact.").

### C. Closing Argument

¶ 22    We also reject Lewicke's claim that prosecutorial misconduct during closing arguments warrants reversal because the prosecutor

(1) expressed improper opinions and (2) referenced facts not in evidence.

¶ 23    First, Lewicke contends that each of the following statements was improper:

- The prosecutor's argument that Holmstrom-Wetzel's recounting of events was "extremely credible under those circumstances."

- The prosecutor's comment that "we know that [Lewicke] doesn't have memory problems; he has [attention deficit disorder (ADD)]."

- The prosecutor's statement that Lewicke's explanation of Holmstrom-Wetzel's location at the time of the shooting was "clearly . . . not credible."

¶ 24    But a prosecutor may argue that a witness's testimony was or was not credible, so long as the arguments are anchored in the evidence. *Domingo-Gomez v. People*, 125 P.3d 1043, 1051 (Colo. 2005).  And each of these statements was connected to facts in evidence:

- The statement about Holmstrom-Wetzel's credibility addressed her ability to recall facts after waking from a coma.  The

11

prosecutor was arguing that Holmstrom-Wetzel was a credible witness even though "she may not have gotten things perfect" during her testimony due to "the effect of trauma and the fact that she had been in a coma for a week."

- The comment about Lewicke's memory, seen in context, was not a statement of the prosecutor's personal opinion but, rather, a reference to Lewicke's testimony that doctors had only diagnosed Lewicke with ADD and not with "memory problems."

- The prosecutor's argument regarding Lewicke's description of Holmstrom-Wetzel's location when she was shot reminded the jury that the evidence showed that, at the time of the shooting, Lewicke had a clear view of Holmstrom-Wetzel; when viewed in context, the prosecutor was asking the jury to conclude that Lewicke's testimony regarding Holmstrom-Wetzel's location at the time of the shooting was not credible.

In short, none of the statements was an expression of the prosecutor's personal opinion.

¶ 25    Likewise, the statement Lewicke contends was an opinion on Lewicke's guilt was not improper.  The prosecutor asked the jury to

consider all the facts and reach "the only verdicts that were consistent with the truth of the case." This was "simply asking the jury to make a reasonable inference that defendant was guilty based on the evidence presented at trial." *People v. Villa*, 240 P.3d 343, 358 (Colo. App. 2009) (holding that the prosecutor's closing argument to "[f]ind [defendant] guilty, because he is guilty" was not a personal opinion of defendant's guilt but, rather, a request that the jury reasonably infer guilt based on the evidence).

¶ 26    Second, Lewicke contends that the prosecutor referenced facts not in evidence during closing argument. Specifically, the prosecutor told the jury that Lewicke had "patted the gun in his holster" as he made a comment to Delapp that he could "pull a gun and take you guys out with me." However, Delapp testified that she did not see a gun. Nor did she describe Lewicke wearing or patting a holster, though she did say that he "like motioned."

¶ 27    A prosecutor is not permitted to intentionally misstate evidence or mislead the jury as to inferences it may draw from that evidence. *Domingo-Gomez*, 125 P.3d at 1049. The People contend that the prosecutor did not misstate the evidence (or at least did not intentionally do so) because (1) Delapp testified that, though she did

13

not see a gun, Lewicke "motioned" as he made the statement; and (2) Lewicke had a holster on his waistband when he was arrested.

¶ 28    But we need not determine whether the prosecutor *intentionally* misstated the evidence because even assuming without deciding that the statement was improper, it does not warrant reversal.  Reversal under a plain error standard is not required when there is overwhelming evidence to support the conviction.  *See Martinez v. People*, 2017 CO 36, ¶ 38 (considering overwhelming evidence in rejecting argument that jury's access to out-of-court interviews was plain error); *People v. Martinez*, 2020 COA 141, ¶ 76 (considering overwhelming evidence when rejecting argument that evidentiary error was plain); *cf. Bartley v. People*, 817 P.2d 1029, 1034 (Colo. 1991) (holding that overwhelming evidence rendered constitutional error harmless beyond a reasonable doubt after assuming aerial surveillance evidence was wrongly admitted).  And there was overwhelming evidence that Lewicke knowingly shot Holmstrom-Wetzel.

¶ 29    Holmstrom-Wetzel testified that, after she knocked on the locked door and asked to get her belongings, she heard "a cocking of the gun"; she again knocked and asked to retrieve her

possessions, took one step, and then was shot through the door. Lewicke did not contradict Holmstrom-Wetzel's testimony, nor did he contradict Delapp's description of the veiled threat to "take [the women] out." Instead, he asserted that he had no recollection of much of the night. Despite his lack of memory, though, he acknowledged that he was likely the person who shot Holmstrom-Wetzel because "there was no one else in the house at the time."

¶ 30    Moreover, no testimony or other evidence suggested that Lewicke acted with mere negligence or recklessness. Consistent with the evidence presented, the jury convicted Lewicke of attempted second degree murder and second degree assault. Therefore, in light of the overwhelming weight of the evidence, any error does not cause us to doubt the reliability of the judgment of conviction. *See Hagos*, ¶ 14.[4]

---

[4] We also reject Lewicke's cumulative error claim. We have identified at most a single error — mischaracterization of the evidence during closing. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25.

### III.    Restitution

¶ 31    Lewicke next challenges the trial court's orders regarding restitution, both as contained in the judgment of conviction entered on July 1, 2022, and in a separate order for restitution entered on November 2, 2022. Specifically, he contends that the trial court erred at sentencing by reserving restitution "on an ongoing basis." In light of *Snow*, we agree.

### A.    Additional Background

¶ 32    At sentencing, the prosecutor informed the trial court that Holmstrom-Wetzel said in her victim impact statement that her medical costs were "ongoing," and, thus, they were not yet "enumerated." The prosecutor requested that, for this reason, the court "make a finding of good cause to allow the People to file for restitution on an ongoing basis as that information comes in to us." The trial court agreed that there was "good cause to preserve the right to file for ongoing restitution" and, accordingly, noted in the judgment of conviction that restitution was "reserved on an ongoing basis."

## B. Standard of Review and Applicable Law

¶ 33    We review the legality of a sentence de novo. *People v. Wiseman*, 2017 COA 49M, ¶ 22. A sentence is illegal if it is "inconsistent with the statutory scheme outlined by the legislature." *Id.* (quoting *People v. Wenzinger*, 155 P.3d 415, 418 (Colo. App. 2006)).

¶ 34    Colorado's sentencing statute requires that every judgment of conviction include one or more of four specific orders regarding restitution:

> (a) An order of a specific amount of restitution be paid by the defendant;
>
> (b) An order that the defendant is obligated to pay restitution, but that the specific amount of restitution shall be determined within the ninety-one days immediately following the order of conviction, unless good cause is shown for extending the time period by which the restitution amount shall be determined;
>
> (c) An order, in addition to or in place of a specific amount of restitution, that the defendant pay restitution covering the actual costs of specific future treatment of any victim of the crime; or
>
> (d) Contain a specific finding that no victim of the crime suffered a pecuniary loss and

17

> therefore no order for the payment of
> restitution is being entered.

§ 18-1.3-603(1), C.R.S. 2022.[5]  A sentence that does not include at least one of these four provisions is illegal and must be corrected. *Snow*, ¶ 24.

### C.    *Tennyson, Johnson,* and *Snow*

¶ 35    As noted, the supreme court instructed us on remand to reconsider our previous opinion in light of its decisions in *Tennyson, Johnson,* and *Snow.*

¶ 36    In *Tennyson,* the supreme court held that when the trial court enters a proper (albeit implicit) order at sentencing under section 18-1.3-603(1)(b) that establishes the obligation to pay restitution but defers until later the determination of the amount the defendant will owe, any challenge to the timeliness of the ultimate determination of that amount is a claim that the sentence was imposed in an illegal manner.  *Tennyson,* ¶ 45.

---

[5] Section 18-1.3-603 was amended in 2025, but the amendments only apply to "defendants sentenced on or after" May 30, 2025.  *See* Ch. 307, sec. 1, § 18-1.3-603, 2025 Colo. Sess. Laws 1606-07.  For the remainder of this opinion, references to section 18-1.3-603 are to the statute in effect in 2022.

18

¶ 37      The opinion in *Tennyson* has little bearing on this case, as Lewicke asserted his challenge to the restitution order in his direct appeal rather than in a Crim. P. 35(a) proceeding.  We do, however, recognize that, in *Tennyson,* the supreme court gave effect to an implicit determination of the obligation to pay restitution; specifically, it treated as an implicit section 18-1.3-603(1)(b) order the sentencing court's language giving the prosecution ninety days to determine "not whether there would be restitution, but rather '*what restitution is due and owing.*'"  *Id.* at ¶¶ 10, 45.  Thus, the case also stands for the proposition that compliance with section 18-1.3-603(1)(b) can be implied from the sentencing order.  This aspect of the case is relevant to our analysis, as we discuss below.

¶ 38      In *Johnson,* the supreme court held that the statutory deadline for determining the amount of restitution is not jurisdictional and can therefore be waived.  *Johnson,* ¶ 25.  The court concluded that the defendant waived his challenge to the fact that restitution was not ordered at sentencing because he signed a plea agreement that said restitution would be determined within ninety-one days after sentencing.  Further, the defendant waived the untimeliness of the ultimate determination of the amount of

restitution because he did not object to the sentencing court's scheduling order that would necessarily delay the resolution of the prosecution's restitution request until after the statutory period had expired.

¶ 39    As with *Tennyson*, the court's opinion in *Johnson* has little bearing on this case. Lewicke did not enter a plea agreement. Nor was there any scheduling order to which Lewicke failed to object that necessarily resulted in the determination of the amount of restitution after expiration of the statutory period. More importantly, *Johnson* did not involve a sentence that failed to include one of the four restitution provisions; the court entered a valid order under section 18-1.3-603(1)(b). Here, in contrast, for reasons we discuss below, the error in Lewicke's sentence is the absence of any of the four required provisions at the time of sentencing. In other words, while *Johnson* (and *Tennyson*) involved the determination of the *amount* of restitution, this case centers on whether there was a timely determination of the *obligation* to pay restitution.

¶ 40    We turn, then, to the impact of *Snow*. In *Snow*, the supreme court held that the sentence was illegal because the sentencing

order failed to include one of the four statutory provisions establishing the obligation to pay restitution. *Snow*, ¶ 23. Moreover, the court held that the sole remedy for such an illegal sentence is vacatur of the untimely restitution order and entry of an order under section 18-1.3-603(1)(d) that no restitution is owed. *Id.* at ¶ 38.

## D.     Analysis

¶ 41     As noted, the trial court ordered that restitution was "reserved on an ongoing basis." This may have been intended as a section 18-1.3-603(1)(b) order because the prosecutor had indicated he could not yet determine the amount of restitution. *See* § 18-1.3-603(2)(a) (authorizing reservation of restitution for ninety-one days if the restitution information is "not available prior to the order of conviction"). Or the trial court may have intended to order, pursuant to section 18-1.3-603(1)(c), that Lewicke owed restitution "covering the actual costs of specific future treatment" for Holmstrom-Wetzel. The restitution language in the judgment of conviction does not give us any indication which of the two orders the trial court intended.

¶ 42    Nor does the language satisfy either provision.  By definition, "ongoing" does not establish a closed-end ninety-one-day period.  And the court did not identify what "specific future treatment" (or treatments) Lewicke would be responsible for.  Certainly, the prosecutor's statement that Holmstrom-Wetzel had "ongoing medical costs" that had "not been enumerated yet" provided justification to grant the prosecution more time to submit restitution information.  And given Holmstrom-Wetzel's horrific injuries (which, according to her victim impact statement, included "a shattered cheekbone, broken eye socket, slashed palate, broken lower jaw, slashed nasal septum, injured sinus and lost [two] teeth"), it is possible that she would need to undergo one or more specific treatments for some time, thus justifying a proper section 18-1.3-603(1)(c) order.  But the order reserving restitution "on an ongoing basis" does neither.

¶ 43    Further, while *Tennyson* permits us to give effect to a sentencing court's *implicit* determination of the obligation to pay restitution in compliance with section 18-1.3-603(1), we do not think the trial court's language is sufficiently clear to give it such effect.  The court did not say that the *amount* of restitution was to

be determined on an ongoing basis; rather, the mittimus said "restitution reserved on an ongoing basis."[6] In our view, this language is not sufficient to imply the determination that Lewicke was responsible for restitution but that the amount would be determined later. Nor, in our view, can the order be read as implicitly ordering restitution for the actual costs of *specific* future treatment, as there was no specificity at the time of sentencing as to what treatment or treatments Holmstrom-Wetzel was undergoing.[7]

¶ 44 We pause to note an arguable disconnect between the narrowness of the factual scenario in *Snow* and the breadth of the supreme court's holding in the case. In describing the facts of the case, the supreme court noted, "As pertinent here, the prosecution did not request restitution or give any indication that it intended to seek restitution. Instead, it simply asked the court 'to reserve

---

[6] With respect to the second degree assault sentence, the mittimus uses slightly different language: "[R]estitution to be filed on an ongoing basis."

[7] Indeed, even the ultimate restitution order was, at least in part, insufficiently tied to specific future treatment. The trial court broadly ordered that Lewicke would be responsible "for the actual costs of the ongoing or future treatment of [Holmstrom-Wetzel] for medical expenses pertaining to this case and mental health therapy."

23

restitution at this point in time.'" *Snow*, ¶ 7.  Indeed, in a footnote, the court further emphasized that the prosecutor did not "even so much as inform the court and Snow that it intended to seek restitution, until it submitted the restitution information some two-and-a-half months after the sentencing hearing."  *Id.* at ¶ 38 n.13.

¶ 45     Nevertheless, the court did not narrow its holding to scenarios in which such facts were present.  Rather, it broadly held that the sentence was not authorized by law "because the mere reservation of the issue of restitution in its entirety failed to adhere to subsection [18-1.3-603](1)."  *Id.* at ¶ 22.  Further, "because the district court failed to enter at least one of the four restitution orders authorized by subsection [18-1.3-603](1), Snow received an illegal sentence."  *Id.* at ¶ 23.  Perhaps most importantly, the court did not leave any room for the application of a remedy other than vacatur and remand for an order that no restitution is owed.

¶ 46     The People argue that *Snow* is distinguishable from this case because everyone in this case knew the prosecution would eventually seek extensive restitution.  The prosecutor began his sentencing argument by noting that the victim's impact statement indicated there were ongoing medical costs that had not yet been

24

"enumerated." The defense attorney urged the court to impose the minimum prison sentence specifically because "[t]here's going to be a substantial amount of restitution due and owing in this case, and he is not going to be paying any of it while he is in the penitentiary." And the court said that it had "heard testimony, evidence, and [it] has read plenty that there are going to be ongoing medical bills that we do not know yet and cannot be quantified today."

¶ 47    We note that the mere fact restitution was actually contemplated at sentencing is not dispositive. In *Weeks*, the prosecutor informed the court at sentencing that "he would be seeking restitution but hadn't filed a motion yet." *Weeks*, ¶ 11. As a result, the sentencing court in that case entered an order under section 18-1.3-603(1)(b), establishing the defendant's obligation to pay restitution but reserving determination of the amount. *Id.* Nevertheless, because that amount was not determined within the statutory timeline, the supreme court held that vacating the restitution order was the proper remedy. *Id.* at ¶ 28; *see also Snow*, ¶ 31 ("We chose the remedy of vacatur in *Weeks* because we could conceive of no other appropriate remedy" for the failure to comply with the statute.).

¶ 48    Similarly, here, the trial court did not comply with the statute. As noted, the court neither (1) ordered that Lewicke was responsible for restitution while reserving for ninety-one days the determination of the amount of restitution nor (2) ordered at sentencing that Lewicke was obligated to pay all costs of any specific treatment or treatments. Instead, the court allowed the prosecution to, "on an ongoing basis, file for restitution." The restitution statute simply does not allow for that path.

¶ 49    Thus, factual distinctions notwithstanding, we are bound by the supreme court's holding in *Snow* that a sentence is illegal if the district court fails to enter "at least one of the four restitution orders authorized" by the restitution statute." *Snow*, ¶ 23. And because Lewicke's sentence is illegal in this way, under *Snow*, the sole remedy is vacatur of the restitution order and remand for the imposition of an order that no restitution is owed. *Id.* at ¶ 38.

## IV.    Mittimus

¶ 50    Finally, Lewicke and the People agree that the mittimus misstates the term of parole associated with Lewicke's attempted second degree murder conviction. Attempted second degree murder is a class 3 felony. *See* § 18-2-101(4), C.R.S. 2025 ("[C]riminal

26

attempt to commit a class 2 felony is a class 3 felony."); § 18-3-103(3)(a), C.R.S. 2025 ("[M]urder in the second degree is a class 2 felony."). The mandatory parole period for a class 3 felony is thirty-six months. § 18-1.3-401(1)(a)(V.5)(A), C.R.S. 2025. But the mittimus reflects a mandatory parole period of sixty months. Because the trial court will have to issue a new mittimus reflecting that no restitution is owed, we direct the trial court to note the correct parole period on the new mittimus.

## V.     Disposition

¶ 51     The order for restitution is vacated. The case is remanded for entry of an order pursuant to section 18-1.3-603(1)(d) that no restitution is owed and an amended mittimus reflecting the correct parole period. The judgment of conviction is otherwise affirmed.

JUDGE LIPINSKY and JUDGE GROVE concur.